[PHILADELPHIA, JANUARY 12, 1835.]

# YARD *against* CRAMOND, who survived HAGA, and Another, assignees of E. & L. BOLLMAN.

## IN ERROR.

The decisions of the commissioners under the treaty with Spain, of the 22d of February, 1819, are, upon all matters, both of law and fact, within the scope of their authority, conclusive, and not open to review, either directly or collaterally, by suit.

*Quere*, whether or not it was the intention of the contracting parties to the treaty, to include all cases of American property traversing the ocean in American vessels, under the protection of the American flag, engaged in lawful commerce, and owned by merchants residing and carrying on trade in any of the ports of the United States, under the sanction of the laws of the United States, whether citizens in the strict sense of the term by birth or naturalization, or in its more extended sense, by domiciliation for commercial and other purposes, and assuming the national character of the country in which they reside.

Where the claims of various persons for indemnity under the treaty, for the loss of cargoes seized and sold in a Spanish port, by order of the public authorities, part of the proceeds of which had been deposited in the Royal Treasury at Lima, and part was due from a Spanish merchant, who had received it, were presented to the commissioners by a common agent, from whose memorial and the accompanying proofs it appeared, that three of those under whom claims were made, were foreigners, domiciliated in the United States, and carrying on trade as American merchants, at the time the loss occurred, and were afterwards, and before the date of the treaty, naturalized citizens of the United States; one of them was at the time of the loss, a foreigner, domiciliated in

(Yard. *v.* Cramond.)

the United States, and carrying on trade as an American merchant, but was never naturalized ; and all the rest were either native or · naturalized citizens of the United States, and the commissioners (after having rejected the first memorial, and receiving another, which supplied the defects of the first,) made a decree, by which they allowed the claim as valid for the proportion of the claimants, of the nett proceeds of the cargo deposited in the Royal Treasury at Lima, " but declared, that from it must be deducted such sums as are claimed by those who are not citizens of the United States, and also, any sum which is claimed under any person who was not such citizen at the time of the loss :" and by a subsequent decree, after adverting to the previous allowance of the claim as valid, they proceed to ascertain the amount thereof, and award to the claimants a certain sum " in full for the loss sustained in the arrest of these vessels at Callao, by order of the Spanish authorities, and the sale of their cargoes, in 1801," which sum they direct to be paid to the agent, " for himself and others."—*Held*, that the decision on its face excluded the interests of all those who were not native or naturalized citizens at the time of the loss and of the treaty, and that the decision of the board in other cases in which claims had been made under some of the same persons, that they were citizens within the meaning of the treaty, was not admissible in evidence to show the opinion of the board as to the citizenship of the same persons, in the case before the Court.

ERROR to the District Court for the City and County of Philadelphia.

The defendant in error, *William Cramond,* who survived *Godfrey Haga* and *Charles G. Paleske,* who, together with himself, were assignees of *Eric & Lewis Bollman,* bankrupts, brought this action against *James Yard,* the plaintiff in error, for money had and received by the defendant below, to the use of the plaintiff below, under the following circumstances.

*Eric & Lewis Bollman,* who were Hanoverians by birth, came to this country in the year 1796, and entered into business as merchants, in the spring of 1797.  *Eric Bollman* married in Philadelphia, in which city and New York he was domiciled until the year 1814, when he went to Europe, and never afterwards returned to the United States.

On the 11th of October, 1802, he was regularly naturalized as a citizen of the United States.

*Lewis Bollman* married in Pittsburg, and was domiciled in the United States, until his death, which occurred a few years ago.  He also was regularly naturalized as a citizen of the United States, on the 11th of October, 1802.

On the 8th of March, 1803, they were both declared bankrupts, and received their certificate of conformity on the 9th of June of the same year.

On the 22d of February 1819, a treaty of amity, settlement and limits, was negotiated between the United States of America, and the King of Spain, which was finally ratified and promulgated on the 22d of February, 1821.  6th *Laws of U. S.* 620.  By the second article of this treaty, his catholic majesty ceded to the United States East and West Florida, in consideration of the sum of five millions of dollars, to be applied in the manner directed by the eleventh article of the treaty.

(Yard *v.* Cramond.)

By the ninth article, the high contracting parties make to each other mutual renunciations. The renunciations of the United States extend, among other things, (in the fourth section) " to all claims of citizens of the United States upon Spain, arising from unlawful captures or seizures at sea, and in the ports and territories of Spain or the Spanish Colonies." In the fifth section they extend to all claims of citizens of the United States, upon the Spanish Government, statements of which soliciting the interposition of the government of the United States have been presented to the department of state, or to the minister of the United States in Spain, since the convention of 1802, and until the signature of that treaty.

The eleventh article is as follows, viz:

" The United States, exonerating Spain from all demands in future, on account of the claims of their citizens, to which the renunciations herein contained extend, and considering them entirely cancelled, undertake to make satisfaction for the same, to an amount not exceeding five millions of dollars. To ascertain the full amount and validity of these claims, a commission, to consist of three commissioners, citizens of the United States, shall be appointed by the President, by and with the advice and consent of the Senate, which commissioners shall meet at the city of Washington, and within the space of three years from the time of their first meeting, shall receive, examine and decide upon, the amount and validity of all the claims included within the descriptions above-mentioned. The said commissioners shall take an oath or affirmation, to be entered on the record of their proceedings, for the faithful and diligent discharge of their duties; and in case of the death, sickness, or necessary absence of any such commissioner, his place may be supplied by the appointment as aforesaid, or by the President of the United States, during the recess of the Senate, of another commissioner, in his stead. The said commissioners shall be authorised to hear and examine on oath every question relative to the said claims, and to receive all suitable authentic testimony concerning the same. And the Spanish government shall furnish all such documents and elucidations as may be in their possession, for the adjustment of the said claims, according to the principles of justice, the law of nations, and the stipulations of the treaty between the two parties of 27th October, 1795: the said documents to be specified, when demanded, at the instance of the said commissioners.

" The payment of such claims as may be admitted and adjusted by the said commissioners, or the major part of them, to an amount not exceeding five millions of dollars, shall be made by the United States, either immediately at their treasury, or by the creation of stock bearing an interest of six per cent. per annum, payable from the proceeds of the sales of public lands within the territories

(Yard *v.* Cramond.)

hereby ceded to the United States, or in such other manner as the Congress of the United States may prescribe by law.

" The records of the proceedings of the said commissioners, together with the vouchers and documents produced before them, relative to the claims to be adjusted and decided upon by them, shall, after the close of their transactions, be deposited in the department of state of the United States ; and copies of them, or any part of them, shall be furnished to the Spanish Government, if required, at the demand of the Spanish minister in the United States."

Under the provisions of the article above recited, commissioners were duly appointed to carry it into effect.

On the 28th February, 1822, *Godfrey Haga* and *William Cramond,* assignees of *Eric* and *Lewis Bollman,* together with several other persons, gave to *James Yard* a power of attorney authorising him to appear before the commissioners and prosecute their claim as owners of the cargo of the brig Dolly, *Thomas Webb,* master, formerly belonging to the port of Philadelphia, for the capture and loss of said cargo, and generally to do whatever might be necessary to effect a recovery of their claim.

On the 1st of March, 1822, Mr. *Yard,* in pursuance of this power of attorney, and a similar one from certain claimants on account of the capture of the ship Asia, presented to the board a memorial, in which among other things he set forth, that he was the agent of his own assignees and of all the other persons originally interested in the transaction thereinafter stated, or of those who represented or claimed under such persons, of all of whom a table was annexed shewing the place of their nativity, the time of their naturalization, when abroad, their residence at the time of the transaction aforesaid, and the character of the claim on the part of each, and whether such claim was original or derivative : That in the year 1799, *Don J. Demas y. Valle,* President or Governor of the Spanish Province of Guatemala, granted sundry licenses to a distinguished merchant of the city of Guatemala, *Don Juan` Bts. Yrissary,* for the importation from foreign ports, especially from the United States, of all lawful merchandize ; to render which licenses available he gave passports to *Don Alexander Ramirez* and *Don Juan Echevria,* agents of *Yrissary,* to proceed to foreign ports. · They came to Philadelphia and addressed themselves to the memorialist, who together with certain persons who becameasso ciated with him, was induced to make the experiment of carrying one of the licenses into effect. The success of this enterprize induced the memorialist and his associates to enter more extensively into the business. The agents above mentioned stated that if vessels should proceed to ports of Guatemala in the Pacific, they might, on their outward voyages touch and trade at the ports of Chili and Peru before they arrived at Guatemala, which was represented as a great advantage. Adopting this plan, the memorialist and his associates, sent two vessels, the ship Asia and

(Yard *v.* Cramond.)

brig Dolly, both the property of the memorialist, with cargoes to the Pacific. . *Yrissary,* sent an agent from Caxidé to Lima to act as consignee of any vessels which might touch at Peru. The cargoes of both these vessels were furnished by the memorialist and several other merchants of Philadelphia who made him their sole agent, and who shipped their goods in his name. The Asia sailed from Philadelphia in October, 1800, for Sonsonati in the Province of Guatemala, with orders to touch at Lima. The Dolly sailed soon after with orders to touch at Valparaiso in Chili. The Asia, without touching at any intermediate port arrived at Callao de Lima about the end of January, 1801, and the Dolly after touching at Valparaiso, also arrived at Callao in June, 1801. When they arrived, the power of the President of Guatemala to grant licenses so broad as those under which they sailed, was denied by the Government of Peru. Both vessels were therefore arrested, their cargoes seized and sold under instructions from government, and the proceeds deposited in the Royal Treasury, but the vessels, after being allowed a small sum on account of freight, were permitted to depart with cargoes, principally on Spanish account, one for Cadiz, and the other for Philadelphia. Though the decrees of the Government required the proceeds of the cargoes to be deposited in the Royal Treasury, yet they were so modified as to admit of their passing through the hands of *Yrissary's* agents, who were permitted to take possession of them on giving bond to place in the Treasury the amount of their appraised value. In this state of things it was determined by the associates of the memorialist that he should go to Spain to petition the King for relief. In 1802 he proceeded to Madrid, and in his own name solicited from the throne, restoration of the property sequestered in Lima. *Yrissary* had an agent in Madrid at the same time, urging the delivery of the property to him. After a protracted period, a royal order for its restoration was granted, but it was so qualified as to give a preference to neither party, and yet to afford a show of justice to both. This royal order was dated August 29th, 1803, and was addressed to the President of Guatemala, apprising him of the removal of the sequestration and *instructing* him to pay to the memorialist and to Mr. *Forbes,* of Jamaica, the balance due to them from *Yrissary,* and to the latter such balance as might afterwards remain in the treasury. Although the royal order had the force of a law, yet great difficulties arose in ascertaining the amount to be received by the memorialist, and he returned to the United States in order to fix that amount. It was determined by those concerned that the memorialist should prosecute the business in the manner he thought best, and to him it appeared that there was but one course to be pursued, which was to effect a settlement with *Yrissary* at Guatemala, and to demand payment of the President of that province agreeably to the royal order. The difficulties attending this course were almost insurmountable. Strangers are generally ex-

(Yard *v.* Cramond.)

cluded from Spanish ports in time of peace, and even if admitted into the sea ports permission cannot be obtained on any terms to penetrate into the interior. The city of Guatemala, the capital of the province, is situated nearly midway between the Atlantic and Pacific oceans. Its port of entry on the Atlantic is Omoa in the Gulf of Honduras, one of the most pestiferous regions of the globe. To that place therefore no person could go from the United States. A vessel was sent to Omoa with a view to open a communication with *Yrissary,* but he detained her so long, that the officers and crew all perished, when he sold the vessel and appropriated the proceeds to his own use. For these reasons, the business was prosecuted languidly and all active measures were suspended. Some time in the year 1807, a letter was received by the memorialist, dated Guatemala, September, 3d 1806, signed by the executor of *Yrissary,* informing him of the death of that gentleman on the 5th of May, 1805, and enclosing an account-current which exhibited a balance in favour of the memorialist of two hundred and thirty-nine thousand one hundred and ninety-nine dollars and one and a quarter rials; but it also advised that an attachment had been laid in Lima, on one hundred and eighty thousand dollars of the funds deposited there by three persons, who had freighted the Dolly, on the ground that she had gone to London instead of Cadiz. The letter also contained an offer to pay the memorialist the balance of fifty-nine thousand one hundred and ninety-seven dollars and one and a quarter rials, provided he would receive it in cocoa at a stipulated price, and would send a vessel to a small port adjacent to Omoa to receive it. A great number of proofs and documents were prepared by the memorialist, as well in reference to the attachment in Lima as to the contested amount in Guatemala. The documents for Lima, together with a power of attorney to Don *Juan B. Oyazzabal,* were sent out which ultimately reached their destination. The documents for Guatemala, together with a power of attorney, were sent to the *Marquis of Ayzinina,* and re iched him in due time. A letter from *Oya-zab il,* dated Lima, November 20th, 1809, informed the memorialist of the removal of the attachment, and one from the *Marquis of Ayzinina,* dated August 10th, 1809, stated that the dispute with the executors oi *Yri sary* had been referred to the Jueces Arbitrios. Another letter from the same person, dated December 18th, 1813, info med the memorialist that he had obtained judgment and was accompanied by a copy of the proceedings in the case. The estate of *Yrissary* was declared bankrupt and surrendered to his creditors. In December, 1814, the *Marquis of Ayzinina* died, and his affairs came into the hands of his brother *Juan Fermin de Ayzinina,* who wrote two letters to the memorialist, one dated the 18th of July, and the other the 3d of September, 1818. In the first, he announces the removal of all difficulty as to the receipt of the money in the Treasury at Lima, about two hundred and two thousand dollars, and offers, when in

(Yard *v.* Cramond.)

possession of it, to remit the amount in indigo.   In the second, he advises of having a decree for the amount of the funds in the Treasury at Guatemala, which had been transferred from that of Lima by order of the President of Guatemala.  Thus, in September, 1818, such progress had been made in the business, that it only remained to receive the official order of the President of Guatemala for the payment of the money.  At this critical moment, notice of the invasion of Florida and capture of St. Augustine, was received at Guatemala.  The agent then suggested to the memorialist certain measures to be taken for the security of the property, which however, were rendered unnecessary by the treaty with Spain, under which the claim was made.  The amount of the claims for the two vessels could not be exactly ascertained, but might be estimated at about three hundred thousand dollars.

The memorial then stated that the cargo of the Asia was divided into twenty-two shares, and held in the following proportions, viz. :

| | | | | | | |
|---|---|---|---|---|---|---|
| *Joshua Sutcliffe*, | - | - | - | - | 4 | Shares. |
| *Samuel Gatcliffe*, | - | - | - | - | 4 | " |
| *John Ashly*, | - | - | - | - | 1 | " |
| *Martin Walker*, | - | - | - | - | 1 | " |
| *Simon Walker*, | - | - | - | - | 7 | " |
| *James Yard.* | - | - | - | - | 5 | " |

That the cargo of the Dolly was divided into one hundred and twenty shares, and held in the following proportions, viz. :

| | | | | | |
|---|---|---|---|---|---|
| *Wm. Read & Co.* | - | - | - | - | 40 Shares. |
| *Samuel Mifflin*, | - | - | - | - | 24 " |
| *E. & L. Bollman*, | - | - | - | - | 15 " |
| *James Yard.* | - | - | - | - | 41 " |
| | | | | | 120 |

It then stated the facts connected with the national character, residence, &c. of the different parties interested in the cargoes of the two vessels, of which it is necessary to give the following only :

" *Martin Walker* came to the United States in 1795; his domicil was in Philadelphia until 1803, when he returned to England—was again in the United States in 1811, 1815 and 1819, and since the latter period has resided in Philadelphia.   In 1802, he married a neice of *Samuel Griffin*, of Williamsburg, Virginia, and is now a citizen of the United States.

" *Simon Walker* came to the United States in 1794; was married in Philadelphia to Miss *Ashly*, now resident in Philadelphia with her children : made an assignment in 1802 to *John Perot, James Taylor* and *John Ashly*, for the benefit of his creditors: went to England in 1803, and has since resided there."

(Yard *v.* Cramond.)

" *Eric Bollman* is a native of Hanover in Germany : came to Philadelphia in 1796, and was domiciled there and in New York until the year 1814, when he went to Europe, and was lately in Santa Fè de Bogota : married in Philadelphia the daughter of Mr. *John Nixon* : was naturalized in 1802."

" *Lewis Bollman,* brother of *Eric,* came to the United States in 1796 : was naturalized in 1802 : was married at Pittsburg, and died there a few years ago."

The memorial, of which the above is an abstract, was presented to the Board of Commissioners, and on the 15th of June, 1822, rejected.

On the 21st of October, 1822, a supplemental memorial, to remedy the defects of that originally presented, was received by the Board.

In this paper Mr. *Yard* met the objections to his first memorial, in the following manner :

In reference to the first objection, viz. : the illegality of the vessels going to Lima, he said, that although he understood the Board had waived this objection in relation to another Lima case, yet he would state, that in this respect, this case differed from all others. The documents for these vessels were prepared for the ports of Guatemala only ; but they had a right to call at any Spanish port on their way. By the Spanish laws of Escala, however, they were not permitted to sell their cargoes unless invited to do so by the local authorities. It was the intention of the shippers by both vessels to do so if permitted. The Dolly touched at Valparaiso and took in refreshments without interruption ; but not being permitted to sell her cargo, proceeded to Lima, where she, as well as the Asia, was detained by the government, not for any irregularity in proceeding to that port, but on the ground of incompetency of the President of Guatemala, to grant the license under which the voyage was undertaken.

In reference to the second objection, which was, that the original memorial did not clearly state that the funds were paid into the Royal Treasury, he averred, after recapitulating some of his former statements that the funds were actually paid into the Royal Treasury.

The third objection was, that the claim seemed to be against an individual and not against the Spanish government. This he answered by stating that the claim was upon the government and not upon *Yrissary,* who was only entitled to what remained after satisfying the claims of the memorialist, Mr. *Forbes,* and others. It was necessary, however, to settle the account with *Yrissary,* in order to ascertain the amount due to the memorialist.

In relation to the fourth objection, viz : That if the funds had been placed in the Royal Treasury, the memorialist had not sought to obtain them from that source in due time, he stated the following reasons for the delay which took place :

1st. His absence from Spain at the time the Royal order was issued.

(Yard *v.* Cramond.)

2d. His inability to appear either in person or otherwise, at Guatemala, as stated in his original memorial and other causes, and the consequent impracticability of his coming in contact with *Yrissary.*

3d. The determination of *Yrissary* and his executors to protract the final settlement of his account as stated in the original memorial.

4th. A royal order to suspend the payment of all deposited funds, in consequence of *Miranda's* expedition, &c.

5th. The refusal of the King to permit the memorialist's case to be arbitrated in the Havanna, as he prayed, so that he might have attended to it in person : and

6th. The necessity of engaging in a law suit in a foreign and insulated country to which he could have no access, and which is proverbial for the interminable character of its law proceedings.

The memorialist then went at length into facts and reasonings to show why the claim was not and could not have been paid in indigo, as mentioned in the original memorial. He also stated, that in saying in his original memorial that in September 1818, " such progress had been made in the recovery of the amount adjudged to him, that it only remained to receive the official order of the President of Guatemala for the amount thereof," he *relied* on the representations of his agent, *Ayzinina*, who was mistaken as to the ability of the Treasury of Lima to discharge the demand of two hundred and two thousand dollars, for which he was to receive the order of the President of Guatemala. He stated a variety of circumstances to show that the offer to pay the admitted balance of fifty-nine thousand dollars in cocoa, was fallacious and merely part of a scheme of fraud. The memorialist added, that he had an interest in these claims arising out of certain agreements between the parties in interest and himself for services to be rendered by him, and concluded with the following averments, viz :—

1. That his claim was presented to the Government, soliciting its interposition, before the signature of the treaty with Spain.

2. That the detention of the vessels, and the sequestration of the cargoes at Lima, were illegal.

3. That the funds proceeding from the sale of the cargoes, were deposited in the Royal Treasury at Lima.

4. That he was not bound to look to *Yrissary* for the payment of his demand, but to the Royal Treasury.

5. That there was no want of diligence in taking the proper measures to enable him to make the demand on the Treasury.

A commission having issued to the City of Washington for the purpose of taking testimony, several depositions and various documents were returned by the commissioners; among others, were the following extracts from the record of the proceedings of the commissioners under the Florida Treaty, viz.—

(Yard *v.* Cramond.)

" No. 1631. Supt. to 1150.   *James Yard*, for himself and others.
" Ship Asia and Brig Dolly."
" Tuesday 29th July, 1823." ·

" Upon examination of the testimony filed in support of this claim, the Board are of opinion, that it be allowed as valid for their proportion of the nett proceeds of the cargoes of these vessels, deposited in the Royal Treasury at Lima; from which must be deducted such sums as are claimed for those who are not citizens of the United States; and also any sum which is claimed under any person who was not such citizen at the time of the loss."

" Monday, 16th February, 1824."
" Ship Asia, *Peterson.* )
" Brig Dolly.          {

" The Board having heretofore received, examined and allowed this claim as valid, this day proceeded to ascertain the amount thereof, and do award to the claimants the sum of one hundred and thirty-six thousand and two hundred and sixty-five dollars, in full for the loss sustained in the arrest of these vessels at Callao, by order of the Spanish authorities, and the sale of their cargos in 1801, which sum is to be paid to *James Yard* for himself (No. 1631,) and others.                                    $136,265 96."

On the 19th of June 1824, a draft on the Treasury of the United States issued in favour of *James Yard* for himself and others, for one hundred and twenty-two thousand and nine hundred sixty-five dollars, seventy-two cents, which contained the following statement :

| | | |
|---|---:|---:|
| " Amount of award, | $124,910 | 46 |
| Deduct as per statement, | 1,944 | 74 |
| | 122,965 | 72 |

On the draft was indorsed a receipt bearing the same date with that of the draft by *James Yard*, for its amount.

On the 19th of July 1824, a second draft issued from the Treasury in favour of *James Yard*, for himself and others, for one thousand four hundred and eighty-six dollars, forty cents, which contained the following statement :

| | | | |
|---|---:|---:|---:|
| " Amount of award, | | $124,910 | 46 |
| Wt. No. 489. 19 June 1824, for $122,965 72 | | | |
| Wt. No. 1133. 19, July -" | 1,486 40 | 124,452 | 12 |
| Suspended | | $458 | 34 |

A statement dated April 27th, 1826, and signed by *James Yard*,

(Yard v. Cramond.)

was given in evidence by the plaintiff below, to whom it was furnished by *James Yard,* showing the proportions to which the different owners of the cargo of the Brig Dolly were respectively entitled, of the amount awarded to them, on the supposition that *E. & L. Bollman* were entitled to participate in the benefit of the award, subject to charges, &c. The proportion of *E. & L. Bollman* was stated to be seven thousand three hundred and thirty-six dollars eleven, cents.

Mr. *Yard* did not resist the claim of the plaintiff, except so far as his commissions were concerned ; but defence was taken in his name by the other shippers on board the Dolly, (with the exception of those representing the claims of Messrs. *Simon & Martin Walker,* which were supposed to be obnoxious to the same objection as that of the plaintiff) on the ground that the Messrs. *Bollman* were not citizens of the United States within the meaning of the treaty, and were consequently excluded from the benefit of the award.

On the trial of the cause the counsel of the plaintiff below, having offered in evidence the testimony taken under the commission to Washington, the counsel for the defendants objected to the report of *Joseph Forrest,* one of the documents returned, and the answer to the second interrogatory. On the objection being made, the evidence was withdrawn for the time by the counsel for the plaintiff.   But after having examined several witnesses to prove the domicil and commercial residence of the Messrs. *Bollman,* and several other matters, which it is unnecessary to state, and after having read in evidence a certificate of the clerk of the District Court of the United States for the Eastern District of Pennsylvania, showing that *E. & L. Bollman* declared their intention to become citizens of the United States on the 13th July, 1798, and were naturalized on the 11th October, 1802 ; they again offered the evidence which they had before offered and withdrawn.   It was objected to again by the defendants' counsel, but his Honour admitted " the written documents tending to show that the commissioners in the cases of the Lenox and Molly did adjudge *J. E. Bollman & L. Bollman* to have been within the meaning of the Florida Treaty, citizens of the United States before they were actually naturalized."   To this opinion of the Judge exception was taken by the counsel of the defendants below.

The evidence admitted by the Court was extracted from the record of the proceedings of the commissioners under the treaty with Spain, and was as follows :—

" Ship Lenox, *Green,* Master,                    ⎫
No. 616. Ins. of North America,            ⎬ Claimants.
No. 870. *Samuel Mifflin,* agent for underwriters. ⎭

" This vessel, the property of *John Steinmoss, Jr.* of Philadelphia, a citizen of the United States, laden with a cargo; the property of *John Leamy* of Philadelphia, *Embeck Henchorff* of Hamburg, and

(Yard *v.* Cramond.)

*Eric & Lewis Bollman* of Philadelphia, sailed from the port of Philadelphia on the            day of            1799, on a voyage, bound to Cadiz, St. Lucar or Gibraltar.   In the prosecution of this voyage, she was captured by a British armed vessel and detained near Gibraltar on the 1st August, 1799.   On the fourth day after, she was released by the captors, who put a Portuguese lad on board as passenger.   The ship Lenox then proceeded for Cadiz, and while on her passage was, on 6th Aug. 1799, captured near Cape Spartel by the French privateer L'Eole, *Armynat,* master, carried into the port of St. Lucar in Spain, and condemned by a French consular court, &c.

"The vessel, freight and cargo were insured on this voyage by the Ins. Company of North America and sundry underwriters in the office of *Shoemaker & Bennett* of Philadelphia, for whom *Samuel Mifflin,* the claimant, is agent, who paid the sums by them insured, to the assured, as an average loss on the cargo and total on the vessel." .

"Report of case by *Joseph Forrest,* clerk."

"Proceedings of the Board,
"Saturday, 5th April, 1823, (Lenox, *Green.*)
"616. Ins. Co. of North America."

"Upon examination of the testimony in support of this claim, the Board are of opinion, that it be allowed as valid for the sums insured, and paid upon the vessel, upon the freight and upon *Leamy's* shipment of goods, and also for the proportion of expenses which fell due upon the vessel, upon the freight and upon the said shipment; from which must be deducted the proper proportion of the sum received of the widow of *Maurice Roberts & Co.*"

"870, *Samuel Mifflin,* as agent, (same vessel.)
"Allowed as a valid claim for the sums insured and paid by the underwriters, Provided, the Board should hereafter be of opinion that the *Bollmans* were citizens of the United States within the meaning of the treaty, at the time of the loss of this vessel and cargo."

"Thursday, Feb'y 12th, 1824,"
"Proceedings of the Board."
"Ship Lenox, *Green.*"

"The Board having heretofore received, examined and allowea this claim as valid, this day proceeded to ascertain the amoun thereof, and do award to the claimants the sum of seventeen thousana and ninety-five dollars, sixty-six cents, in full for the loss sustained in the capture of this vessel by the French privateer, L'Eole, *Armynat,* master, carrying her into the port of St. Lucar, and having her and her cargo condemned by a French consul in 1799, which sum is to be divided as follows, viz."

(Yard *v.* Cramond.)

| | | | | | |
|---|---|---|---|---|---|
| No. 616. To Ins. Co. of N. Am., | - | - | - | $9,245 | 66 |
| 870. *Samuel Mifflin,* as agent, | | - | - | 7,850 | 00 |
| | | | | 17,095 | 66 |

Estimated by the Board:—

| | | | | | | |
|---|---|---|---|---|---|---|
| Value of the vessel, | - | - | - | $8,000 | | |
| Freight, - | - | - | - | 4,000 | | |
| *Leamy's* cargo, - | - | - | - | 1,500 | | |
| *Bollmans'* cargo, | - | - | - | 7,850 | | |
| | | | | | 21,350 | 00 |
| Deduct sum received, | - | - | - | - | 4,556 | 18 |
| | | | | | 16,793 | 82 |
| Expenses, | - | - | - | - | 301 | 84 |
| | | | | | $17,095 | 66 |

In the case of the ship Molly, *Flinn,* master, it appeared from the evidence, taken under the commission to Washington, that on the 26th February, 1823, the Board allowed the claims for losses in this case; but their record declared, that from this allowance was to be deducted " the value of that part of the cargo owned by the *Bollmans,* should the Board be finally of opinion that they were not citizens of the United States within the meaning of the treaty."

On the 6th of February, 1824, the Board proceeded as follows:
" Molly, *Flinn :*—

" The Board having heretofore examined and allowed this claim as valid, this day proceeded to ascertain the amount thereof, and do award ·to the claimants the sum of $194,872 26, (less $765 30 unclaimed), in full for the loss sustained in the capture of this vessel by several Spanish gun boats, &c., in 1801, which is to be divided as follows, viz."

Then followed a statement of the division of the amount awarded, which included the following:

" Unclaimed of *Bollmans'* interest, $765 30."

" There was no claim put in by the *Bollmans,* or any body for them, for their uninsured interest."

" J. F."

After the above evidence had been given, the counsel of those persons who took defence in the name of the defendant, offered in evidence a paper signed, " *T. Watkins,* Secretary to the late Commissioners," purporting to be a certificate by him, that upon the examination of the books of the commissioners, then in his possession, he found certain matters touching the opinion of the Board as to the citizenship of *E. & L. Bollman.* The evidence offered, was objected to by the plaintiff's counsel, and overruled by the judge,

who at the request of the counsel offering it, noted an exception to his opinion.

Much evidence was given on the trial in the District Court, touching the amount of compensation claimed by Mr. *Yard,* for his services in recovering the fund in dispute, but as no question arising out of it came before this court, it is deemed unnecessary to state it.

The judge was requested to instruct the jury

1. That the *Bollmans'* interest is clearly and conclusively rejected by the decision of the commissioners, on the face of their awards.

2. That the term ' citizen' as used in the treaty, is to be construed to mean, either the native or naturalized citizen; and that the plaintiff is not entitled to recover on the ground, that the *Bollmans* are, by reason of commercial residence, to be considered as citizens, within the treaty.

3. That if the *Bollmans* are entitled by construction, to be considered as citizens, so are the *Walkers.*

4. That if the plaintiff is entitled to recover, it is only the amount of *Bollmans'* interest, after deducting the amount of the insurance.

In reference to the first point submitted to him, his Honour, after having commented upon the proceedings and decrees of the Board of commissioners, in the case of the Asia and Dolly, and upon the other evidence admitted by him, explanatory of those decrees, particularly the decrees in the cases of the Lenox and Molly, and giving his reasons for having admitted such evidence, instructed the jury that, " neither on the face of the decrees, nor by any other evidence shown, was he satisfied that the Board of commissioners had decided the point against *Justus Eric Bollman* and *Lewis Bollman,* but rather the reverse. The plaintiff, the surviving assignee, was therefore entitled to recover what was justly due to them, and what must be taken to have been recovered and received on their behalf."

Upon the second point he declared to the jury, that " on full reflection and after a careful review of authorities, he was of opinion that *Justus Eric Bollman* and *Lewis Bollman,* though certainly not within the *letter,* were within the *purview,* within the *spirit* and *meaning* of this treaty."

In relation to the third point he informed the jury that he could not instruct them as he had been requested, that " if the *Bollmans* are entitled, by construction, to be considered as citizens, so are the *Walkers,*" the case of the *Walkers* not being then before the court. He recommended however to the counsel to enter into an agreement (which was done) by which the interest of the *Walkers* in the fund in the hands of Mr. *Yard,* should not be affected by the verdict to be rendered in this case, in the event of the suits brought by them or their representatives being successful.

As to the last point his Honour directed the jury to ascertain how

(Yard *v.* Cramond).

much had been received from underwriters on account of this loss, but to find a verdict without deducting it, and the court would lessen the verdict by so·much if the underwriters were not entitled to it—if they were, the court would hold the plaintiff a trustee *pro tanto,* and lay hands upon the fund for the benefit of the underwriters.

The opinion delivered by the court to the jury was excepted to by the counsel of those who opposed the claim of the plaintiff below, and on the return of a writ of error to this court, the following errors were assigned.

1. The Court below charged the jury that under the Florida treaty persons were entitled to participate in the fund provided who were commercial residents, although not citizens of the United States by birth or naturalization.

2. The Court charged the jury that they had nothing to do with the claim of the *Walkers*—although the admission of their claims would greatly reduce the amount to be received by the respective claimants; each of whose share would depend upon the number who should be entitled to participate in the fund.

3. The Court charged that all commercial residents were entitled to participate in the fund provided by the Florida treaty, and yet authorised the exclusion of certain persons thus *circumstanced,* whereby the defendant is made liable to pay a sum of money to the plaintiff which he may be liable to pay over again *to other* persons.

4. The Court below admitted in evidence the return of a commission to Washington with the depositions and documents therein contained.

5. The Court rejected the certificate of *Tobias Watkins* after admitting the documents annexed to the plaintiff's commission to Washington.

6. The judgment of the Court below is erroneous, and the plaintiff in error assigns general errors.

The cause was argued at December Term, 1833, by *J. R. Ingersoll* and *Chauncey,* for those who resisted the claim of the plaintiff below, the real plaintiffs in error, and by *Scott* and *Rawle,* jun. for the defendant in error, *T.* and *J. Sergeant* who were of counsel with the nominal plaintiff in error, taking no part in the argument. It was again argued by the same counsel at December Term, 1834, *T. Sergeant,* who had been previously appointed one of the Justices of this court, took no part in the decision of the cause, and *J. Sergeant,* the counsel of Mr. Yard, did not participate in the argument.

*Arguments for the real plaintiffs in error.*

1. It seems to be admitted on all hands, that the decisions of the board of commissioners, within the scope of their authority, are final and conclusive. That authority was to receive, examine and decide upon the amount and validity of the claims presented to·

them.    The inquiry then is, 1st, whether, on the face of their pro-
ceedings, they have decided upon the claim under the *Bollmans,* and
if they have, whether they have rejected or admitted it.

2. If this does not appear on the face of the proceedings, does the
extrinsic evidence admitted by the court below, establish their right
under the treaty?    To understand the decision of the board, it is
necessary to refer to the matter before them and the evidence given
in relation to it.    The memorial of Mr. *Yard,* sets forth the different
interests of the persons represented by him, in relation to some of
whom it appears that they were not citizens of the United States,
at the time of the loss or subsequently.    The *Bollmans* were aliens
born and became citizens by naturalization in 1802, which was after
the loss.    From the two decisions of the board of 29th July, 1823,
and February 16th, 1824, it appears that among the claims present-
ed by Mr. *Yard,* were those of persons not citizens of the United
States, and that these were rejected.    Who were the aliens and who
the citizens?    The *Bollmans* were clearly not citizens in 1801,
when the loss occurred.    The decision adopts no fanciful interpreta-
tion of the term citizen, but uses it in the legal and only accepted
manner in which it could be used by them.    It seems then from
the face of the decisions that the commissioners have decided the
question adversely to the claim of the *Bollmans,* and if they have,
it is not denied that their decision is conclusive.

Extrinsic evidence has however been admitted for the purpose of
explaining these decisions, the operation of which it is necessary to
consider.    If there was any ambiguity on the face of the proceedings
of the board, the evidence relied upon is not calculated to remove it.
The decisions in the cases of the Lenox and the Molly are different
in principle from that now under consideration, and there is nothing
like the adoption of the principle of the one decision in the other.
What is the character of the evidence?    It is to prove citizenship
*de facto,* arising from commercial residence, not citizenship *de jure,*
as the basis of the supposed decision of the commissioners, that the
*Bollmans* were citizens within the meaning of the treaty.    Thus, if
the defendant in error can prove that they were commercially
citizens, he will raise on this foundation an argument, that the com-
missioners, after having in terms excluded all who were not citi-
zens, but admitted a claim under the *Bollmans* in other cases, have
necessarily decided on this ground, that they were citizens.    To
suppose the board have proceeded on any such ground, is to suppose
they have done what they had no right to do.    Their office was to
decide on claims of citizens of the United States, and on the validity
of such claims their decision is conclusive.    But they had no right
to decide that an alien is a citizen, and such a decision would not be
conclusive.    It would be in contravention to the treaty.    They did
not and could not give to it so fanciful an interpretation as that of
the District Court, that although not within the letter, the *Bollmans*

(Yard *v.* Cramond.)

were within the purview of the treaty. The language of a treaty is to be carefully scrutinized and to be understood according to its meaning in the state in relation to which it is used. In the 9th and 11th sections the term *citizens,* is used, and not *inhabitants,* and these are the sections under which the claim is made. The use of the term *inhabitants* in other sections and in reference to other objects, shows that these terms were adopted with care and discrimination and were not intended to be understood as convertible terms. In the language of all nations the word *citizen,* has a definite meaning, but no where is it so clearly ascertained as in the United States, where the term means one who by birth or naturalization has acquired municipal rights; not one, who by commercial residence has become entitled to protection and to certain privileges. The inference from a decision in other cases, different in their circumstances, ought to have no operation in determining this case. The court do not know what the evidence in those cases was. There may have been produced a false certificate of naturalization. But the court do know that the evidence produced in this case proved that they were neither native nor naturalized citizens at the time of the loss. Besides, the claimants in the cases of the Lenox and Molly were insurers who were citizens of the United States, and had paid the loss. They were the real sufferers at the time of the loss, to which the policy related back, and they came within the terms of the treaty. They cited *Con. U. S.* art. 6. sec. 2. *The Venus,* 8 *Cranch,* 253. *The Frances, Id.* 335. *Arnold* v. *The United Ins. Co.* 1 *Johns. Ca.* 363. *The Pizarro,* 2 *Wheat.* 228, 231. *Campbell* v. *Mullett,* 2 *Swans.* 553. *Comegys* v. *Vasse,* 1 *Peters,* 211, 212. 216. *Duguet* v. *Rhinelander,* 1 *Caines Ca. in Er.* xxv. *Wilson* v. *Marryatt,* 8 T. R. 31, S. C. 1 *Bos. & Pull.* 430. *Livingston* v. *The Marine Ins. Co.* 7 *Cranch,* 536. 1*st Kent's Com.* 163. *Vattel,* 103, B. 1. C. 19, sec. 220.

2. In reference to the exception founded upon the admission of evidence, by the court below, taken under the commission to Washington, they cited *Taber* v. *Perrot,* 2 *Gall.* 565. *Baring* v. *Fanning,* 1 *Paine,* 549. *Hunt's Lessee* v. *McNeil,* 1 *Wash. C. C. R.* 70, *Stevelie* v. *Read,* 2 *Wash. C. C. R.* 274.

3. They contended that if the claim under the *Bollmans* was admitted and paid, it was liable to deduction to the amount of the interest insured, which diminished to that extent, the interest of the claimants.

The questions involved in the other specifications of error, were not argued.

*Arguments for the defendant in error.*

The main question in the District Court, to which the others were ancillary, was whether or not the claim of the *Bollmans* had been allowed; for as the treaty gave the commissioners the power to

decide conclusively upon the validity of the claims presented to them, it follows, that if their claim was admitted, the plaintiff was entitled to recover from Mr. *Yard,* whether they were citizens or not, and if the claim was rejected, he could not recover, even if they were clearly citizens. The interlocutory decree of July 29th, 1823, allowed the validity of the claim, subject to a deduction on account of foreign interests, without specifying what they were; and the final decree of February 16th, 1824, awarded to the claimants generally a certain sum, which was ordered to be paid to *James Yard,* for himself and others. This decree making no distinction between foreign and American interests, must be understood to embrace all the claimants represented by their common agent, the doubt as to the citizenship of some of them, having been removed. Those therefore, who contend that the claim under the *Bollmans,* was rejected are bound to show it, independently of the language of the decision. They did not attempt to do so, and this was perhaps enough for the plaintiff below. But it was open to him to strengthen his case, by showing that they were considered citizens by the commissioners, and this he could do, in the first place, by showing that they actually were citizens within the meaning of the treaty, and that therefore, the commissioners must have decided that they were so; and secondly, that the commissioners' actually did so decide, as appeared from their proceedings in reference to those individuals, in other cases of the same character.

The first question then is, whether under the Florida treaty, persons who were neither native nor naturalized citizens, but who were domiciled here, and carrying on commerce as American merchants were entitled to indemnity for losses sustained by Spanish seizure, in the prosecution of their business as American merchants. Nothing is more clear, than that by the law of nations, a man may acquire a national character, and enjoy all its advantages, so far as relates to commerce, not only independently of, but directly in opposition to his original character. In all cases therefore, of prize and insurance, in all cases whatever, in which national character is the subject of inquiry, as connected with commerce, the inquiry is, not to what country the party owes allegiance according to municipal laws, but of what country is he a citizen, or subject according to the law of nations; and this inquiry is fully satisfied, by shewing what is his commercial domicil. So far is this principle carried, and so entirely is original national character lost, for certain purposes, by the acquisition of a new commercial domicil, that the courts of a man's native country will condemn his property as enemy property, merely on the ground of his being domiciled in the enemy country, *Livingston* v. *The Maryland Ins. Co.,* 7 *Cranch,* 507. *The Venus,* 8 *Cranch,* 253. *The Francis,* 1 *Gall.* 614. *Arnold* v. *United Ins. Co.,* 1 *John. Cas.* 363. *Tabbs* v. *Bendelach,* 4 *Esp. N. P. Cas.* 108. *Vattel,* B. 2, ch. 6, pp. 251, 252. B. 1, ch. 16, p. 157. B. 1,

(Yard *v.* Cramond.)

ch. 19, p. 166.   Unless then, there is a difference between the words
"citizen" and "subject," as used in reference to cases of prize and
insurance, and as used in a treaty, these authorities are conclusive.
It is not easy to perceive on what foundation such a distinction rests.
It is applied to all persons having a commercial domicil, and
extended to all commercial concerns.   Domicil stamps national
character as to every thing connected with commerce, though it
does not open the door to immunities and privileges, which depend
on municipal laws.   In determining the meaning of the word, as
used in the Florida treaty, it is proper to inquire what objects it had
in view.   A number of American merchants, natives, naturalized
and domiciled, had large claims against the government of Spain, for
the spoliation of their property.   Indemnity for the loss of this
*American* property had been the subject of frequent and fruitless
application to the Spanish government, and our own government,
interposed its offices for its recovery.   The claims of those interested
in the cargoes of the Asia and Dolly, had been the subject of the
application of the government of the United States, and no distinc-
tion was made between those who were native or naturalized, and
those who were domiciled citizens.   The property confiscated, was
American property, because it belonged to American citizens, and
was entitled to protection as such.   When the treaty of 1819 was
formed, the United States exonerated Spain from all such claims,
and undertook to satisfy them to the extent of five millions of dollars.
By the words of the treaty, our government exonerated Spain from
all claims of American citizens; the plain and obvious meaning of
which is, that Spain was released from all claims on account of
American property, the term citizen being used to signify those who
represented such property.   Any other construction would be in
the highest degree unjust and fruitless, to those who had settled
here, confiding in the protection of our government.   Their claim
on Spain was gone.   If it had been made, the answer would have
been, that the cession of Florida had extinguished all claims founded
on the confiscation of American property.   As Hanoverians, the
*Bollmans* could make no claim on Spain, because Spain was then at
war with Hanover, and if the property was Hanoverian property,
it was rightfully confiscated.   But it would have been in violation
of the law of nations to call it Hanoverian property.   The only
quarter to which they could look, was the government of the United
States, in whose protection they had confided, and who were bound
to protect their property as American property.   It is urged that
strict criticism should be applied in construing a treaty, in which
every word is weighed and considered.   Where shall we be landed,
if we construe the word *citizen,* with critical precision?   It is defined
by the best English lexicographers, to be "a freeman of a city, not
a foreigner; not a slave," "a townsman, a man of trade; not a gen-
tlemen"—"an inhabitant, a dweller in any place."   The meaning

(Yard *v.* Cramond.)

given of the corresponding Spanish word used in the treaty, *cuida-dano*, is "a livery man of a city"—"a freeman who enjoys the privileges of a city"—"an inhabitant of a city." It would be absurd to give the term the same signification, in reference to every subject. If there be any instrument to the interpretation of which the principles of the law of nations peculiarly apply, it is a treaty, with which the municipal law has nothing to do. The 11th section of this treaty makes the law of nations, and the stipulations of the treaty of 1795, the rule of interpretation, and the 15th section of the treaty of 1795, when applied to that of 1819, shows that citizens by domicil were included. To show the idea attached by the English courts to the term *citizen*, when used in a treaty, the case of *Maryatt* v. *Wilson*, 1 *Bos. & Pull.* 430, will be sufficient. This was not a case of prize of war, but of citizenship; under a treaty authorizing citizens of the United States, to trade to British ports in the West Indies, from which British subjects, except the East India Company, are rigorously excluded; yet a native British subject was considered as having so entirely changed his national character by commercial domicil, as to be within the terms of the treaty. Though the parties in that case are spoken of, as adopted or naturalized citizens of the United States, yet it no where appears that they had become so otherwise than by domiciliation; and even if they had been regularly naturalized under the laws of the United States, that would not have affected the principle, since nothing is more notorious than that Great Britian never permits a subject entirely to put off his allegiance, though, in common with all other civilized nations, she permits him to divest himself of national character, so far as to become a foreign merchant, and enjoy all the privileges incident to that character. Qualified commercial citizenship, in a foreign country, she recognizes in her subjects, complete municipal citizenship, she does not. It is clear then, that the intention of the contracting parties was, to extend the benefit of the treaty to all who bore the character of commercial citizens, whose interests the United States were bound to protect, because their property was American property.

But there is abundant evidence to shew that the board considered the *Bollmans* citizens, within the meaning of the treaty, and that evidence was competent. The cargoes of the Asia and Dolly, were not the only ones in which they had an interest. They had interests in those of the Lenox and Molly, and claims were presented by persons in whom those interests were vested. When these cases first came before the board, they made an interlocutory decree, as in the case of the Asia and Dolly, allowing the claim, provided they should be of opinion, that the *Bollmans* were embraced by the treaty. Having satisfied themselves on that subject, they afterwards allowed the whole claim, which they apportioned among all the claimants, including those who claimed under the *Bollmans*. The final decrees

(Yard *v.* Cramond.)

in these cases were given a few days before that of the Asia and Dolly came up for final adjudication. Having settled the principle in these two cases, under circumstances precisely similar, they of course applied it to the case before them. If it be said that their interests had passed into the hands of insurers, who were citizens, the answer is twofold. In the first place, the commissioners were to look to the original character of the claim, without regard to those in whom it had become vested; *Comegys* v. *Vasse*, 1 *Peters*, 211; and in the second place, the interest of the *Bollmans* in the cargoes of the Asia and Dolly, had passed to assignees, who were citizens, for the benefit of creditors, who were also citizens.

Was the evidence to prove this fact admissible? The only evidence admitted by the District Court, was the record of the proceedings of the commissioners in the two cases referred to. No parol evidence was offered or received. The report of *Forrest*, the regularly constituted agent of the board, was strictly part of the record. The argument that the decision in those cases, is between other parties, loses sight of the peculiar character of the tribunal, and the object for which the evidence was offered. Though possessing a judicial character, the board do not resemble an ordinary court of law, in which one party impleads another, and the judgment given, affects themselves alone. It was a court of peculiar and exclusive jurisdiction. Before the board all the claimants under the treaty, were parties to all the cases, and it was the interest of each to exclude the others, the fund to be distributed being inadequate to the payment of all the demands upon it. It was a proceeding *in rem*, upon the fund, and in such case, the decision binds all the world. 1 *Phill. Ev.* 248, (267.) *Gelston* v. *Hoyt*, 13 *John.* 561. 1 *John. Ch. R.* 543. 1 *Phill. Ev.* 254, (273,) 231, (251,) 233, (253,) 234, (254,) *notes. Stark. on Ev.*, pt. 2, 115, 167, 173, 176. *Ib.* pt. 4, 1300, *Geyer* v. *Aguilar*, 7 *T. R.* 681. It is to be observed too, that the evidence was not offered as the basis of the plaintiff's claim, against the defendant, nor for any of those purposes for which evidence is usually offered, but to show the decision of the board, upon the construction of a treaty; to show that they had fixed a principle by which all cases of an analogous character were to be governed.

The opinion of the Court was delivered by

Rogers, J.—This is an action of *assumpsit*, for money had and received, brought by *Cramond*, the surviving assignee of *Eric* and *Lewis Bollman*, to recover their proportion of the sum of 136,265 dollars, awarded by the Commissioners under the Florida treaty, to *James Yard*, and others. The following extract, from the record, contains all that properly belongs to the case.

"Proceedings, in the case of *James Yard*, claimant on account of the cargoes of the ship Asia and the brig Dolly, before the

(Yard *v.* Cramond.)

Commissioners under the treaty between the United States and Spain.

"The memorial No. 1150, was filed the 20th February, 1822. This memorial was examined by the Board, on the 15th June, 1822, and rejected.

On the 21st October, 1822, a supplemental memorial was filed, No. 1631, and with the original memorial, received on that day by the Board.

On Tuesday 29th July, 1823, the following proceedings, among others, took place.

No. 1631. *James Yard,* for himself and others—ship Asia and brig Dolly.

Upon examination of the testimony filed in support of this claim, the board are of opinion, that it be allowed as valid, for their proportion of the nett proceeds of the cargoes of these vessels deposited in the royal treasury at Lima, from which must be deducted, such sums as are claimed for those who are not citizens of the United States, and also any sum which is claimed under any person who was not such citizen at the time of the loss.

On Monday, 16th February, 1824, the board proceeded as follows:—

> Ship Asia, *Peterson.*
> Brig Dolly.

The board having heretofore received, examined, and allowed the claim, as valid, this day proceeded to ascertain the amount thereof, and do award to the claimants, the sum of one hundred and thirty-six thousand two hundred and sixty-five dollars, in full, for the loss sustained in arrest of these vessels at Callao, by order of the Spanish authorities, and the sale of their cargoes in 1801, which sum is to be paid to *James Yard,* for himself and others, $136,265,96.

It is conceded by the defendant in error, and but faintly denied by the plaintiff, that the decree of the commissioners is conclusive, and of course not open to review, either directly or collaterally by suit. Independent of the authorities cited, on the conclusive nature of such decrees, the treaty itself furnishes evidence that such was the intention of the contracting parties. The United States exonorating Spain from all demands in future, on account of claims of citizens, &c. and considering them entirely cancelled, undertook to make satisfaction for the same, to an amount not exceeding five millions of dollars. To ascertain the full amount and validity of these claims, a commission to consist of three commissioners, citizens of the United States, were to be appointed by the President, &c. which commissioners were to meet at the city of Washington, and within the space of three years from the time of their first meeting, to receive, examine, and decide, upon the amount and validity of all the claims included within the descriptions mentioned in the

(Yard *v.* Cramond.)

treaty. The commissioners were required to take an oath or affirmation, to be entered on the record of their proceedings, for the faithful and diligent discharge of their duties, &c. They are authorized to hear and examine on oath, every question relative to said claims, and to receive all suitable authentic testimony concerning the same. It is required that the payment of such claims as may be admitted and adjusted by the commissioners, to an amount not exceeding five millions, shall be made by the United States, either immediately, &c. or by creation of a stock bearing interest, &c. The record of the proceedings of the commissioners, together with the vouchers and documents produced before them, relative to the claims to be adjusted and decided upon by them, shall after the close of the transactions be deposited in the department of state, of the United States; and copies of them or any part of them, shall be furnished to the Spanish Government, if required, at the demand of the Spanish Minister, in the United States.

By this summary of powers and duties of the board, it will be seen that the commissioners are invested with full and plenary authority to decide every question, as well the amount as the validity of the claims included in the treaty, whether the matter in dispute arises from objections as to the fact, or the law. The commissioners are ordered to keep a record of their proceedings, which together with the documents are ordered to be filed in the office of the Secretary of State, as well for the use and inspection of the Spanish Government, as of our own. There is nothing in the treaty which countenances the idea, that either party can resort to the ordinary tribunals of the country, to alter or control the decisions of the commissioners. It would then be an assumption of authority on the part of this court, to attempt to review the decision of this tribunal created by the contracting parties, for the speedy and final adjustment of all claims preferred under the treaty. It is then plain, that the principal, if not the only point, is to ascertain from the lights we have, what was the decision of the commissioners, for whether right or wrong, in law, or in fact, is immaterial, as we have no power to examine and correct the mistake, if any exists. Notwithstanding this, however, the plaintiff's and defendant's counsel invoke the aid supposed to be derived from the interpretation of the treaty of the 22d February, 1819. They both claim the benefit of the presumption, that the commissioners have decided as they ought to have decided. For explanation of the decree, they have gone into an extended and able examination of the meaning of the term, "citizens" of the United States, used in the treaty as descriptive of the class of persons entitled to the benefit of the fund. It is contended on the one hand, that the interpretation of the word citizen, is to be settled, not by its definition, in a merely municipal sense, but as it has been, and ought to be interpreted by the law of nations, and the decisions of the courts of prize. That it was the intention of the contracting

(Yard *v.* Cramond.)

parties to include all cases of American property traversing the ocean, in an American vessel, under the protection of the American flag, engaged in a lawful commerce, and owned by merchants residing and carrying on trade in any of the ports of the United States, under the sanction of the laws of the United States, whether citizens in the strict sense of the word, by birth or naturalization, or its extended sense, domiciliated for commercial and other purposes, and assuming the character of the country in which they reside.

On the other hand, it is insisted, that by the term citizen, must be understood citizen, in the strict sense of the word, as known to the constitution and laws of the United States. That the provisions of the treaty, are for citizens of the United States, and the subjects of Spain, and that we must resort to the laws of each country, to know what they respectively meant, by citizens and subjects. That a citizen of the United States, must be either native or naturalized, and that subjects of Spain, are those who owe her full and not temporary allegiance. That a commercial resident, is not embraced, either within the words, or the spirit of the treaty. The point is of great importance, and not without difficulty, but as a decision of the question is not absolutely required, I am instructed to say, that the court do not wish to be considered as having formed any opinion upon it. It is deemed most prudent to decide the question when it directly arises, and not, as in this case, for the benefit of a presumption, which, whatever might be our sentiments in regard to it, would not alter the judgment in this cause.

The principal question, arises from the answer of the court to the defendant's first point, " that the *Bollmans*' interest is clearly and conclusively rejected, by the decision of the Commissioners, on the face of their awards." To this point, I shall now direct my attention, and shall proceed to examine the nature and extent of the sentence, or decree of the Commissioners on the claims represented by Mr. *Yard*, arising out of the seizure of the cargoes of the ship Asia, and brig Dolly. Did the Commissioners include the claim of indemnity, made on account of the *Bollmans* and the *Walkers?* If the claims were disallowed, with or without reason, there is no pretence to say, the plaintiff can recover in this suit, for the award is the foundation of their action. And however we may regret the situation in which the error of the Commissioners may have placed the parties, we cannot afford the necessary redress. In the interpretation of these decrees which are, it must be admitted, wanting in precision, we must refer to the matter which was before the board; and this appears from the memorial, and the documentary evidence filed in pursuance of the directions of the treaty, and which form part of the proceedings. The claim for the whole interest in the Asia and the Dolly, was made by Mr. *Yard*, in virtue of a letter of attorney, from the persons interested in the cargoes. The memorial stated the different interests of the parties concerned, together with the

(Yard v. Cramond.)

national character of the individuals, whom he represented. That the *Bollmans* were aliens born, and had been naturalized in 1802, a time subsequent to the loss. That the *Walkers* were also aliens born; that one of them had never become a citizen, but that the other had; and that all the other claimants were either natural born, or had been naturalized previously to the loss. The memorial of Mr. *Yard* also showed, that the claim was divided into two parts. One for the money, which was deposited in the royal treasury at Lima, amounting to upwards of 202,000 dollars, the other, for a sum due from a Mr. *Yrissary*, which he had received out of the proceeds of the sale of the cargoes of the Asia and the Dolly. The first memorial was rejected, but the second, which contains a full and able examination of the whole case was received; but still it is apparent, that two objections remained, the one to the claim on account of the money due from *Yrissary*, the other an objection to the national character of the *Bollmans* and the *Walkers*. Of this, we cannot entertain a doubt, for they alone came within the discription of commercial residents; the others, without exception, were either native born, or naturalized citizens. With these representations, the proof accompanying them, and the question of national character for decision, the commissioners decreed, "that the claim is valid, for their proportion of the nett proceeds of the cargoes of these vessels, (Asia and Dolly,) deposited in the royal treasury at Lima, from which must be deducted such sums as are claimed by those, who are not citizens of the United States; and also, any sum which is claimed under any person, who was not such citizen at the time of the loss."

The commissioners decree, that the claim, viz. Mr. *Yard's* claim, is valid, (it must be recollected, the whole claim was at first rejected,) but they confine the award to the sum deposited in the royal treasury at Lima, excluding that part of the claim, made by Mr. *Yard*, on account of the money received by *Yrissary*. If the decree had stopped here, who could have doubted the intention of the commissioners, to include the Messrs. *Bollmans* and *Walkers?* But unfortunately for them, the decree contains an exception, which is senseless, unless it is construed to embrace their case. For it proceeds to say, "from which must be deducted such sums, as are claimed by those who are not citizens of the United States; and also, any sum which is claimed under any person, who was not such citizen at the time of the loss."

The question has been asked, to which no satisfactory reply has been given, why except from the benefit of the fund, those who are not citizens of the United States, unless it was intended to exclude those who were not citizens, in the strict municipal sense of the term. Why introduce any exception into the decree at all, unless it was designed to exclude the claim of the *Bollmans* and the *Walkers*, whose claims alone are included within the exception, and to whose demand after the presentation of the second memorial, alone objec-

(Yard *v.* Cramond.)

tions were made.  A sum was claimed by and for the *Walkers,* one of whom was not then a citizen, and the other was not at the time of the loss, and a sum was claimed by the assignees of the *Bollmans,* who were not citizens at the time of the loss.   The sentence of the commissioners has a direct and special reference to these claims, and to none other; and to give the decree any other construction, we must suppose that the commissioners used language without meaning, and inapplicable to the case before them.

The decree, it must remarked, is in its nature interlocutory, and not final.   It was necessary for the commissioners, in addition to an order, as regards the right of the different class of claimants, to settle the amount to which Mr. *Yard,* as the representative of the persons whose claims were allowed, was entitled.   In pursuance of this further duty, on the 16th February, 1824, the commissioners made a final award, as follows :

" The board having heretofore received, examined, and allowed the claim as valid, this day proceeded to ascertain the amount thereof, and do award to the claimants, the sum of one hundred and thirty-six thousand two hundred and sixty-five dollars, in full, for the loss sustained in the arrest of these vessels at Callao, by order of the Spanish authorities, and the sale of their cargoes in 1801; which sum is to be paid to *James Yard,* for himself and others."

If the interpretation of the interlocutory decree be correct, there is nothing in the final decree, which does, or purports to interfere with that interpretation.   It is in no part intimated, that a re-examination and change of opinion on the part of the commissioners, had taken place, but on the contrary, the former decision is made the basis of the final award.   The commissioners refer to and incorporate their first order in the final decree, in language which cannot be mistaken.   It is inconceivable, that in an affair of such magnitude, if the minds of the commissioners had undergone a change on the legal point, whether a commercial resident was embraced by the treaty, something should not appear on the record of their proceedings, indicative of such change of opinion.   The former order is expressly referred to, and confirmed, so as to constitute but one decree, and these decrees are in the most perfect harmony with each other.   Nor does the use of the word " claimants," invalidate this construction.   That word, if we give language its ordinary import, has reference to those, who before had been decided to be lawful claimants, and citizens of the United States, in a municipal sense.   The conclusion to which the court has come, is strengthened by the fact, that the amount claimed by Mr. *Yard,* deposited in the Royal treasury at Lima, is upwards of 202,000 dollars.   It does not appear, that any reason was alleged for the reduction of that amount, except the disallowance of these claims, and yet we find, that the board allowed only 136,265 dollars, which is about the sum Mr. *Yard* would be

(Yard v. Cramond.)

entitled to receive, after deducting the amount claimed, on account of the Messrs. *Bollmans* and the *Walkers.*

It is in vain then, to allege that it is ungenerous to refuse them a participation in the fund. It would be a manifest wrong; that they should be paid at the expense of the other shippers. If the *Bollmans* have been injured, it is not by the other claimants, but by the sentence of the tribunal, whose duty it was to receive, examine, and settle all conflicting claims, and to whom full power was committed, to decide all questions of law and fact.

This opinion of the court, disposes of the whole case, and thus dispenses with the necessity of a minute examination of the principles of evidence, ruled at the trial. The evidence was admitted for purposes of explanation, but as the proceedings do not need the aid of extrinsic evidence, it was clearly inadmissible on that ground. But in addition to this, there is no principle better settled, than that a judgment or decree of a court is evidence, in another suit only, as against parties and privies. But it is said, that this was a proceeding *in rem,* and as such binding on all parties. And in one sense this is true, but this cannot make the proceedings in another case, between other parties, and under different circumstances, evidence, to control the plain import of the decree itself.

Judgment reversed.