RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0018p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

TIMOTHY EUGENE ELVIS DAVIS,

                  *Plaintiff-Appellant*,

     *v.*

SIG SAUER, INC.,

                  *Defendant-Appellee*.

> No. 24-5210

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:22-cv-00010—Gregory F. Van Tatenhove, District Judge.

Argued:  November 26, 2024

Decided and Filed:  January 27, 2025

Before:  MOORE, THAPAR, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Samuel A. Haaz, SALTZ MONGELUZZI BENDESKY, P.C., Philadelphia, Pennsylvania, for Appellant.  Kristen E. Dennison, LITTLETON PARK JOYCE UGHETTA & KELLY LLP, Purchase, New York, for Appellee.  **ON BRIEF:**  Robert W. Zimmerman, SALTZ MONGELUZZI BENDESKY, P.C., Philadelphia, Pennsylvania, for Appellant.  Kristen E. Dennison, B. Keith Gibson, Jonathan T. Woy, LITTLETON PARK JOYCE UGHETTA & KELLY LLP, Purchase, New York, Marshall R. Hixson, Robin E. McGuffin, Kyle S. Schroader, STITES & HARBISON, PLLC, Lexington, Kentucky, for Appellee.

     MOORE, J., delivered the opinion of the court in which DAVIS, J., concurred. THAPAR, J. (pp. 25–36), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  On January 23, 2021, Timothy Davis inadvertently shot himself in the leg with his Sig Sauer P320 X-Carry pistol ("P320") while he was getting out of his truck.  Davis claims that the pistol was fully holstered at the time of the shooting and that he did not pull the trigger.  According to Davis, the P320 is defectively designed because it is unreasonably likely to fire inadvertently, reasonable alternative designs exist that could make the P320 safer for consumers, and those alternative designs would have prevented his injury.  Accordingly, he brought a products-liability action under Kentucky law, sounding in strict liability and negligence, against Sig Sauer, the manufacturer of the P320.

Following discovery, the district court granted Sig Sauer's motions to exclude Davis's expert witnesses—firearms expert, James Tertin, and human factors expert, Dr. William J. Vigilante, Jr.—and Sig Sauer's motion for summary judgment.  The district court found that neither expert could opine on whether any alleged defect in the P320 caused Davis's injury because neither expert investigated the exact factual circumstances of the shooting incident.  Without expert testimony, the district court held that Davis could not pursue a products-liability action under Kentucky law.  Davis has appealed this judgment.

For the reasons explained below, we **AFFIRM IN PART** and **REVERSE IN PART**.  Although the district court correctly excluded Davis's experts from testifying about what exactly caused Davis's P320 to fire inadvertently, the experts' opinions were otherwise admissible to prove other elements of Davis's claims—specifically that the P320 is defectively designed and that reasonable alternative designs exist.  Because we reverse the district court's decision to exclude completely the expert witnesses, we also hold that Davis has demonstrated a genuine issue of material fact as to whether the P320 was defectively designed and caused his injury.  We therefore **VACATE** the grant of summary judgment and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual Background

On January 23, 2021, Davis was shot in his left leg when his P320 inadvertently fired while he was getting out of his truck.  R. 41-1 (Davis Dep. at 64:4–10) (Page ID #982).  Davis testified that the gun was fully holstered when it fired and that he did not intentionally pull the trigger.  *Id.*  Contrary to Davis's testimony, law enforcement responding to the scene after the incident reported that Davis informed the police that he "was attempting to holster his weapon on his side when the gun accidentally discharged."[1]  R. 41-2 (Police Report at 3) (Page ID #986). The officer also reported that "Davis's clothing was likely a key component to the firearm accidentally discharging."  *Id.*  When the officer arrived at the scene, the P320 "still had the spent shell casing in the chamber, which had failed to extract."  *Id.*

### B.  Procedural Background

On January 11, 2022, Davis filed a products-liability suit in Kentucky state court, R. 1 (Notice of Removal ¶ 4) (Page ID #2), and Sig Sauer removed the action to federal court on February 1, 2022, *id.* at 1 (Page ID #1).  On August 12, 2022, Davis amended his complaint and brought two products-liability claims against Sig Sauer under the theories of strict liability and negligence.  R. 18 (Am. Compl. ¶¶ 96–112) (Page ID #130–34).  Sig Sauer answered on August 26, 2022.  R. 19 (Answer at 1) (Page ID #137).

Both parties disclosed expert witnesses.  Davis submitted the expert opinions of James Tertin, a professional gunsmith, and William Vigilante, a risk-analysis expert.  *See* R. 39-6 (Tertin Report at 2) (Page ID #689); R. 40-5 (Vigilante Report at 2) (Page ID #817).  Their opinions are discussed in depth below.  Sig Sauer submitted its own expert, Derek Watkins.  R. 41-11 (Watkins Report at 1) (Page ID #1213).  Watkins examined Davis's P320, *id.* at 7–14 (Page ID #1219–26), reconstructed the shooting incident, *id.* at 15–22 (Page ID #1227–34), and compared the P320's mechanics and safety features with competitor pistols and firearms, *id.* at

---

[1]The officer's report that the gun was not fully holstered when it fired is supported by the responding EMT's report, R. 41-3 (EMT Report at 2) (Page ID #989), eyewitness testimony, R. 41-16 (Mills Dep. at 21:5–21) (Page ID #1371), and Sig Sauer's expert witness who recreated the incident, R. 41-11 (Watkins Report at 15–22) (Page ID #1227–34).

23–38 (Page ID #1235–50). Watkins concluded that the P320 is not defectively designed, that the P320 is designed for users who do not want to use a manual safety on their pistol, and that the cause of Davis's injury was his mishandling of the P320. *Id.* at 40–41 (Page ID #1252–53).

Following discovery, Sig Sauer filed three motions. First, Sig Sauer filed a motion to exclude Tertin's expert opinion. R. 39 (Mot. to Exclude Tertin at 1) (Page ID #535). Second, Sig Sauer filed a motion to exclude Vigilante's expert opinion. R. 40 (Mot. to Exclude Vigilante at 1) (Page ID #760). Finally, Sig Sauer filed a motion for summary judgment on Davis's two products-liability claims. R. 41 (Mot. Summ. J. at 1) (Page ID #958). On January 4, 2024, the district court granted all three motions. *Davis v. Sig Sauer, Inc.*, No. 3:22-cv-00010-GFVT, 2024 WL 54595, at *1 (E.D. Ky. Jan. 4, 2024).

## C. Tertin's Expert Opinion

Tertin is a professional gunsmith with over fifty years of experience. *See* R. 39-6 (Tertin Report at 2) (Page ID #689). In forming his opinion, Tertin examined Davis's P320, "an exemplar Sig Sauer P320," and "several competitor pistols" along with "the literature for 39 base models of commercially available pistols . . . . These 39 base models and their clones represent over 300 pistols sold in the United States." *Id.* at 1 (Page ID #688). The purpose of Tertin's report was "to analyze the adequacy and sufficiency of the safety mechanisms on [Davis's P320]." *Id.* at 2 (Page ID #689). Tertin explained that "the P320 functions as a single-action striker-fire pistol." *Id.* at 4 (Page ID #691). The upshot of Tertin's opinion was that "the trigger travel distance of a single-action gun makes it very easy for the trigger to be inadvertently actuated by a part of a user's body or a foreign object." *Id.* at 8 (Page ID #695). Despite the P320's "very minimal trigger movement" before firing, *id.* at 12 (Page ID #699), Sig Sauer designed the P320 to rely solely on internal safeties, i.e., safety mechanisms that are not activated by the user, *id.* at 8–12 (Page ID #695–99). Tertin concluded that the P320 was "unreasonably dangerous and defectively designed" for these reasons. *Id.* at 18 (Page ID #705).

Tertin proposed three reasonable alternative designs, each of which would add an external safety mechanism to the P320, to make the P320 safer for consumers and that also could have prevented Davis's incident.  First, Tertin proposed a "thumb safety," which "is a switch on the side of the pistol that can be flipped on or off with the user's thumb."  *Id.* at 13 (Page ID #700).  "Unless and until the thumb safety is flipped down [into fire mode], the trigger cannot be actuated."  *Id.*  Second, he proposed a "grip safety," which "is a lever on the grip of the pistol that must be depressed for the trigger to be able to actuate and fire the gun."  *Id.*  "A grip safety requires virtually no extra effort on the part of the user, because their hand would naturally depress the safety as they were holding the pistol."  *Id.*  Finally, he proposed a "trigger safety" which "is a small tab within the trigger that must be depressed for the trigger to be able to fully depress and fire the weapon."  *Id.* at 14 (Page ID #701).  "Trigger safeties are able to effectively and efficiently prevent accidental discharges because they require a user's finger to be placed squarely on the center of the trigger prior to the pistol being discharged."  *Id.*  In assessing the reasonableness of these alternative designs, Tertin compared the P320 with Sig Sauer's direct competitors.  *Id.* at 13–16 (Page ID #700–03).  Notably, in his deposition, Tertin disclaimed any analysis of the circumstances of the incident or whether the trigger of Davis's P320 was actuated in such a way that any of the proposed external safety mechanisms would have in fact prevented the shooting.  R. 39-1 (Tertin Dep. at 94:25, 95:1–25, 96:1–2, 131:13–21) (Page ID #579, 588).

**D.  Vigilante's Expert Opinion**

Davis hired Vigilante as a "human factors" expert to study the risks posed by the P320's design and whether those risks contributed to the likelihood of Davis's injury.  R. 40-5 (Vigilante Report at 2) (Page ID #817).  Vigilante has a master's degree and Ph.D. in ergonomics and more than twenty-five years of research experience in the field.  *Id.*  Vigilante applied industry-standard risk-management principles and guidelines in studying the P320 generally, competitor firearms, relevant expert opinions, and evidence of other P320 accidental discharge incidents.  *Id.* at 2–5 (Page ID #817–20).  Vigilante concluded that Sig Sauer should have known that the P320 was at an increased risk for unintentional discharges because it lacked an external safety, and that the inclusion of an external safety would have been "a prudent and reasonable method to safe guard [sic] users from the risk associated with the unintentional discharge of the Sig P320."

*Id.* at 32–33 (Page ID #847–48).  Vigilante also concluded that the lack of an external safety was a cause of Davis's injury.  *Id.* at 33 (Page ID #848).  Just like Tertin, Vigilante did not investigate the factual circumstances of the incident to determine whether any defect in the P320 caused Davis's injury.  R. 40-4 (Vigilante Dep. at 13:17–24, 14:1–13, 15:1–10) (Page ID #811–13).  But, unlike Tertin, Vigilante did not examine Davis's P320 in preparing his opinion.  *Id.* (Vigilante Dep. at 10:22–24) (Page ID #809).

**E.  District Court's Opinion**

On January 4, 2024, the district court granted Sig Sauer's motions to exclude Davis's expert witnesses and its motion for summary judgment.  *Davis*, 2024 WL 54595, at \*1.  Applying Federal Rule of Evidence 702, the district court found "that Mr. Tertin's conclusion that the lack of a manual safety was the proximate cause of Mr. Davis's accident is pure speculation."  *Id.* at \*2.  The district court's analysis primarily rested on the fact that "Mr. Tertin performed no analysis as to what may have pulled the trigger" of Davis's P320 or whether any manual safety would have prevented Davis's injury.  *Id.*  The district court acknowledged that "it may be 'common sense' that some types of manual safeties reduce the number of unintentional discharges," but the court stated that "Mr. Tertin provide[d] no empirical evidence to prove as much," and Tertin made "no attempt to even determine what may have depressed Mr. Davis's trigger . . . ."  *Id.*  According to the district court, "Vigilante's opinion suffer[ed] a similar fate" because he did "not have any opinion on how Mr. Davis's trigger became engaged."  *Id.* at \*3.  Finally, the district court concluded that Vigilante's reliance on YouTube videos of P320 unintentional discharges and a memorandum by U.S. Immigration and Customs Enforcement ("ICE") were unreliable bases for assessing whether the P320 is at a higher risk than competitor pistols for inadvertent shootings.  *Id.*

Once Davis's experts were completely excluded, the district court granted Sig Sauer's motion for summary judgment.  *See id.* at \*4–5.  The district court found that Davis could not show a genuine issue of material fact regarding causation without expert testimony.  *Id.*  Because the inner mechanics of the P320 would be an enigma to the lay juror, the district court found that Kentucky law required expert testimony to bring a products-liability action.  *Id.*  Without any

expert witnesses for Davis, the district court determined that summary judgment was appropriate. *Id.*

## II. DISCUSSION

The Kentucky Products Liability Act governs this diversity action. The Products Liability Act is "a codification of preexisting common-law principles," and "defines a 'product liability action' as 'any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation . . . warning, instructing, marketing, advertising, packaging or labeling of any product.'" *Smith v. Wyeth, Inc.*, 657 F.3d 420, 423 (6th Cir. 2011) (alterations in original) (quoting Ky. Rev. Stat. § 411.300(1)). "The [Products Liability Act] applies to all damage claims arising from the use of products . . . regardless of whether the action is founded on strict liability in tort, negligence or breach of warranty." *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky. 1997).

"Kentucky applies a risk-utility test in design defect cases." *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004). "[T]he fact finder in a design defect case must decide whether the manufacturer that placed in commerce the product made according to an intended design acted prudently, i.e., was the design a defective condition which was unreasonably dangerous."[2] *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980). The risk-utility test "implicitly require[es] proof of a reasonable alternative design . . . ." *Toyota Motor Corp.*, 136 S.W.3d at 42 (quoting Restatement (Third) of Torts: Products Liability, § 2 cmt.d); *accord Primal Vantage Co. v. O'Bryan*, 677 S.W.3d 228, 249 (Ky. 2022), *as modified after reh'g*, (Ky. 2023). "Proof of legal causation is required in cases involving liability for products" and "legal causation may be established by a quantum of circumstantial evidence from which a jury may reasonably infer that the product was a legal cause of the harm." *Holbrook v. Rose*,

---

[2]The dissent seems to suggest—without caselaw in support—that a person injured by a defectively designed product cannot sustain a products liability case if they purchased the product knowing that it lacked certain safety features. *See* Dissent at 26–27. This is not the standard. Kentucky law is clear that "the fact finder in a design defect case must decide whether the manufacturer that placed in commerce the product made according to an intended design acted prudently, i.e., was the design a defective condition which was unreasonably dangerous." *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980). Thus, the appropriate question is whether Sig Sauer acted prudently in its design of the P320, not whether Davis acted prudently in his decision to purchase the P320.

458 S.W.2d 155, 157 (Ky. 1970).  Under Kentucky law, a plaintiff must prove "actual injury or harm to the plaintiff *and* legal causation between the defendant's breach and the plaintiff's injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003).  As to the latter, a plaintiff can meet this requirement by showing that the defendant manufacturer's "conduct [was] a substantial factor in bringing about [the] plaintiff's harm." *King v. Ford Motor Co.*, 209 F.3d 886, 893 (6th Cir. 2000); s*ee also Huffman v. SS. Mary & Elizabeth Hosp.*, 475 S.W.2d 631, 633 (Ky. 1972).  "[L]egal causation[] presents a mixed question of law and fact." *Pathways, Inc.*, 113 S.W.3d at 89.  "Therefore, whether a plaintiff's damage was caused by the tort defendant typically 'should be left to the jury to determine.'" *Stathers v. Garrard Cnty. Bd. of Educ.*, 405 S.W.3d 473, 479 (Ky. Ct. App. 2012) (quoting *Eichstadt v. Underwood*, 337 S.W.2d 684, 686 (Ky. 1960)).

For the reasons that follow, we hold that the experts' opinions are admissible to prove Davis's product-liability claims.  Although we agree with the district court that the experts do not have a factual basis on which to opine on causation of the incident, their testimonies are admissible for other purposes.  Both experts provide reliable and helpful testimony in explaining the intricacies of the P320 and reasonable alternative designs that Sig Sauer could have implemented to make the P320 less susceptible to inadvertent actuation.  In this case, the question of causation is straightforward:  Did Davis actuate his P320 from a side-pull or graze that an external safety would have prevented?  Both Tertin and Vigilante help the trier of fact answer this question by explaining how the P320 works, what makes it unreasonably susceptible to inadvertent actuation, and how reasonable alternative designs could have prevented Davis's injury if it was in fact actuated from a side-pull or graze.  That Tertin and Vigilante declined to investigate facts underlying causation of the actual incident does not render their opinions entirely inadmissible.

For these reasons, we affirm in part and reverse in part the district court's ruling on Sig Sauer's motions to exclude, and we then vacate the district court's ruling on summary judgment.

**A. Rule 702 Analysis**

We review the district court's decision to exclude expert testimony for abuse of discretion. *See United States v. LaVictor*, 848 F.3d 428, 440 (6th Cir. 2017).

> Current Federal Rule of Evidence 702 permits expert testimony if:
>
> the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[3]   The party proffering the expert bears the burden of showing by a preponderance of the evidence that the expert testimony satisfies Rule 702. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008); *accord* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("This is the preponderance of the evidence standard that applies to most of the admissibility requirements set forth in the evidence rules.").

Federal Rule of Evidence 702 requires district courts to act in a gatekeeping role to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "[W]e generally defer to the district court's judgment, and will reverse the district court 'only if we are firmly convinced that the district court erred,' such as by basing its ruling on an erroneous interpretation of the law." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 315–16 (6th Cir. 2019) (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001)). However, "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d

---

[3]On December 1, 2023, Rule 702 was amended. *See In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 n.4 (6th Cir. 2024). The amendment enacted two principal changes. First, the amendment clarified that the preponderance-of-the-evidence standard applies to Rule 702. Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Second, Rule 702(d) was "amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* The committee has clarified that "[n]othing in the amendment imposes any new, specific procedures," and that "nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support." *Id.*

517, 530 (6th Cir. 2008) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

### 1. Experts' Causation Opinions

We affirm the district court's finding that Tertin's and Vigilante's expert reports lacked reliable factual bases for their opinions regarding causation. *Davis*, 2024 WL 54595, at *2–3. Both experts testified that the exact factual circumstances leading to Davis's accident were irrelevant to their analyses of the P320's alleged design defects. Accordingly, the district court was correct in holding that neither expert could opine on what exactly caused Davis's gun to fire inadvertently. This issue turns on whether Tertin's and Vigilante's expert opinions on causation considered what caused the trigger on Davis's P320 to actuate. As the district court correctly concluded, neither expert investigated the exact circumstances leading to Davis's inadvertent shooting injury.

Federal Rule of Evidence 702 states, in relevant part, that expert testimony must be "based on sufficient facts or data," Fed. R. Evid. 702, including "facts or data in the case that the expert has been made aware of or personally observed," Fed. R. Evid. 703. "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (citing *Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990)). Where an expert bases their opinion on assumed facts, "mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *In re Scrap Metal*, 527 F.3d at 530 (alterations in original) (quoting *McLean*, 224 F.3d at 801). "[I]t is up to opposing counsel to inquire into the expert's factual basis." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) (citing *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988)). Ultimately, "[a]n expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds, based on what is known." *McLean*, 224 F.3d at 800–01 (quoting *Pomella v. Regency Coach Lines, Ltd.*, 899 F. Supp. 335, 342 (E.D. Mich. 1995)).

As the district court correctly concluded, neither Tertin nor Vigilante considered what precisely caused Davis's gun to fire.  Because neither expert considered the circumstances of the shooting incident, their expert opinions are not admissible for this limited purpose.  As Tertin testified at his deposition, he could not "say a tab trigger would have prevented the accident" because he did not know how in fact the accident occurred.  R. 39-1 (Tertin Dep. at 95:20–25, 96:1–2) (Page ID #579).  For Tertin, the circumstances of the accident were less important than whether the P320's mechanics are unreasonably dangerous and whether reasonable alternative designs could make unintentional discharges less likely.  *See id.* (Tertin Dep. at 131:13–21) (Page ID #588).  Tertin, however, did not reconstruct the accident to determine in what exact manner Davis inadvertently fired his P320, and Davis did not seek to introduce Tertin's opinion for that purpose.  *Id.* (Tertin Dep. at 79: 18–25, 80:4–10) (Page ID #575).  Vigilante's testimony follows a similar path.  He testified at his deposition that he had no opinion on what "caused the trigger movement in this case," R. 40-4 (Vigilante Dep. at 13:17–24, 14:1–13) (Page ID #811–12), and that he had done no testing of the physical evidence "to determine whether [Davis's] testimony is plausible or possible," *id.* (Vigilante Dep. at 15:1–10) (Page ID #813).

For these reasons, the two experts did not reasonably apply their principles or methodologies to the underlying facts of causation, and so their opinions are inadmissible for purposes of establishing how Davis inadvertently actuated his P320—a necessary predicate to the determination of legal causation.  This case is dissimilar to *In re Scrap Metal*, *McLean*, and *Jahn v. Equine Servs., PSC*, 233 F.3d 382 (6th Cir. 2000), the cases Davis relies on in support of his appeal.

In *In re Scrap Metal*, the defendants moved to exclude an expert's testimony because the expert's method for calculating the price of scrap metal relied on faulty underlying marketplace data.  *See* 527 F.3d at 524–27.  On appeal, we held that the expert's opinion was admissible because "he performed his analysis according to a reliable method . . . and reliably applied that method to the facts of this case."  *Id.* at 531.  "The question of whether [the expert's] opinion [wa]s accurate in light of his use of the [faulty] data [went] to the weight of the evidence, not to its admissibility . . . ."  *Id.*  Here, neither Tertin nor Vigilante applied their analyses of the P320's design defects to any of the facts of Davis's accident.  Instead, the two experts considered only

whether reasonable alternative designs could more effectively prevent inadvertent actuation from side-pulls or grazes. Because both experts specifically disclaimed applying their methods to the facts of the accident at issue, we cannot conclude that they reliably applied their methodologies to the facts of the case regarding causation.

This case is also unlike *McLean*. The plaintiffs in *McLean* had put on differing "theories of causation" to explain an allegedly negligent plane crash. 224 F.3d at 803–04. The theories offered different, but not "fatally contradict[ory]," explanations. *Id.* at 804. We held that the differing expert opinions were admissible because, even if the theories were equally likely, "they both point[ed] to the same culprit." *Id.* In the scenario where both theories trace back to the wrongdoing of the defendant, the trier of fact could be convinced by either expert and find the defendant liable. Neither Tertin nor Vigilante have a theory regarding precisely what caused the inadvertent firing of the firearm. Even though both experts here have theories about how certain safety features could prevent inadvertent shootings given certain factual predicates, neither opined on whether those factual predicates exist in this case. Rather, both experts assumed that Davis actuated his P320 via a side-pull or graze without showing exactly how Davis did so. This is not like *McLean* which involved competing theories that appeared incongruous; instead, Tertin and Vigilante do not discuss causation at all.

Finally, we contrast this case with *Jahn*. In *Jahn*, as Davis points out, we held that, in certain instances, an expert's opinion may lack certainty but still be admissible under Federal Rule of Evidence 702. Appellant Br. at 27 (citing *Jahn*, 233 F.3d at 390). The plaintiff in *Jahn* had put forward experts who could not determine the exact cause of death of the plaintiff's horse, but the experts could opine on the probable cause of the horse's death. *Jahn*, 233 F.3d at 390. We held that the experts' testimonies were admissible because "[t]he fact that several possible causes might remain 'uneliminated' . . . only goes to the accuracy of the conclusion, not to the soundness of the methodology." *Id.* (ellipsis in original) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996)). Our holding was "due in considerable part to the lack of [] records kept by the defendants." *Id.* "Both experts noted that their analysis was hampered by the lack of records, and it seem[ed] [to us] patently unfair to allow [the defendant] to *benefit* from what seems to be a deplorable, and perhaps even negligent, absence of record-keeping." *Id.*

(internal citations omitted). In other words, an expert's ability to reach a firm conclusion on causation is commensurate with the available evidence. Where the evidence admits uncertainty, we do not hold experts to a more exacting standard than that evidence allows. Here, however, neither Tertin nor Vigilante have attempted to opine on what exactly caused the inadvertent gunshot. In fact, both experts testified that the exact cause of actuation was irrelevant to their opinions. R. 39-1 (Tertin Dep. at 94:25, 95:1–25, 96:1–2) (Page ID #579); R. 40-4 (Vigilante Dep. at 13:17–24, 14:1–13) (Page ID #811–12). Accordingly, this case is unlike *Jahn*. This is not a case about the inexactitude of an expert's opinion reflecting poor recordkeeping. Rather, in this case, both experts expressly disclaimed any opinion on the main aspect of causation.

Ultimately, there is nothing to suggest that the district court abused its discretion in excluding the experts from opining on causation when it is clear neither expert in fact studied the precise cause of the injury in this case.

### 2. Experts' Opinions on Design Defect and Reasonable Alternative Designs

We do reverse, however, the district court's decision to exclude Tertin's and Vigilante's opinions in their entireties.[4] Although we agree that the experts should not be allowed to opine on the actual cause of this incident, the experts' opinions are otherwise admissible because their opinions are reliable and relevant to proving design defect.

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

---

[4]Before the district court, Sig Sauer moved to exclude Vigilante's expert opinion on the ground that he is not qualified as an arms expert. R. 40 (Mot. to Exclude Vigilante at 4) (Page ID #763). The district court declined to address this argument. *Davis*, 2024 WL 54595, at *2 n.1. Sig Sauer has not renewed this argument on appeal. Even if it had, we would reject this argument. Vigilante is a qualified risk-analysis expert: He has two higher degrees in the field, is a certified professional ergonomist, and has more than 25 years of research experience in the field of risk analysis. R. 40-5 (Vigilante Report at 2) (Page ID #817). Vigilante's lack of expert qualifications in firearm design is not a persuasive reason to exclude his testimony. *See Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 848–51 (6th Cir. 1981) (holding that an expert with bio-mechanical engineering qualifications could testify as to the design defect in a child's car-seat despite lacking specific expert qualifications in the design of such car-seats).

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

First, Tertin's and Vigilante's opinions will "help the trier of fact" in determining whether the P320 is defectively designed under Kentucky law. Fed. R. Evid. 702(a). Under Kentucky's risk-utility test, "the fact finder in a design defect case must decide whether the manufacturer that placed in commerce the product made according to an intended design acted prudently, i.e., was the design a defective condition which was unreasonably dangerous." *Nichols*, 602 S.W.2d at 433. This test "implicitly require[es] proof of a reasonable alternative design . . . ." *Toyota Motor Corp.*, 136 S.W.3d at 42 (quoting Restatement (Third) of Torts: Products Liability, § 2 cmt.d). Ultimately, "to recover for a design defect under Kentucky law, a plaintiff must establish existence of an alternative, safer design that is practical under the relevant circumstances . . . ." *Primal Vantage*, 677 S.W.3d at 249.

Both experts will assist the trier of fact in determining whether the P320 is unreasonably dangerous and whether reasonable alternative designs exist that were practical under the relevant circumstances. These are essential elements of a Kentucky design-defect claim. For these reasons, their testimonies pass muster under Federal Rule of Evidence 702(a). In this case, both Tertin and Vigilante provide relevant, helpful, and reliable testimony on the design of the P320, its possible dangerousness, and reasonable alternative designs. Their testimonies are not any less helpful or reliable simply because the experts do not opine on a related, but independent, element of a design-defect claim (causation). Because the design intricacies of the P320 are well beyond the common knowledge and understanding of the average lay person, Davis's claim requires expert testimony on design defect and alternative designs, and he has offered relevant and reliable expert testimony in support of these claims. Tertin's expert opinion goes in depth about the design of the P320, how it is unreasonably dangerous without external safeties, and how the P320 is more likely than other commercially available firearms to fire inadvertently from jostling, side-pulls, and grazes. R. 39-6 (Tertin Report at 3–19) (Page ID #690–706).

Specifically, Tertin concluded that "[t]he P320 is unreasonably dangerous and defectively designed because the combination of its extremely short single-action trigger-pull and lack of external safeties makes it far too easy for the trigger to be accidentally actuated." *Id.* at 18 (Page ID #705). Tertin offered three reasonable alternative designs: "a manual thumb safety, grip safety, or tabbed trigger safety . . . ." *Id.* Vigilante comes to similar conclusions relying on similar evidence. *See* R. 40-5 (Vigilante Report at 32–33) (Page ID #847–48). Given the complexity of the P320's design, not only are these opinions helpful for the trier of fact, but they are also required under Kentucky law. *See Commonwealth, Dep't of Highways v. Robbins*, 421 S.W.2d 820, 824 (Ky. 1967) (recognizing the necessity of expert testimony "for a proper understanding of that which requires scientific or specialized knowledge and which cannot be determined intelligently from testimony on the basis of ordinary knowledge gained in the ordinary affairs of life").

It would be strange to preclude entirely an expert opinion necessary under Kentucky law. Imagine the scenario where a plaintiff puts on two experts: one to discuss firearm design and another to recreate the accident. That the firearm design expert did not opine on the circumstances of the accident would be no reason to exclude that expert's testimony in its entirety. This is especially pertinent considering that proof of an alternative design is a required element of a design-defect claim under Kentucky law. *See Primal Vantage*, 677 S.W.3d at 249; *see also Toyota Motor Corp.*, 136 S.W.3d at 42 ("[D]esign defect liability requires proof of a feasible alternative design."). Just as the hypothetical plaintiff who puts forward separate experts on design and accident recreation should be allowed to do so, so too should Davis be permitted to introduce the expert opinions of Tertin and Vigilante. In this context, both experts' opinions will help the trier of fact in determining whether the P320 is unreasonably dangerous and whether reasonable alternative designs exist—two essential elements of a design-defect products-liability claim.

Second, both experts' opinions are "based on sufficient facts or data." Fed. R. Evid. 702(b). Tertin, in assessing the P320's dangerousness and reasonable alternative designs, inspected the firearm, described the mechanics of single versus double action pistols, explained the function of striker-fire pistols and how firearm manufacturers design safety systems for these

types of pistols, compared the P320 to other pistols on the market that use alternative safety designs, and tested various methods of pulling the P320's trigger from side-pulls and grazes. *See* R. 39-6 (Tertin Report at 3–17) (Page ID #690–704); *see also* R. 49-18 (Tertin Tabbed Trigger Videos) (Page ID #2574). Tertin's observations on the P320's design and how it compares to similar pistols manufactured by competitors are based on sufficient facts or data. Under Kentucky law, "evidence of alternative designs employed by other manufacturers . . . may indicate that an inferior design was unreasonably dangerous applying the reasonably prudent manufacturer standard." *Nissan Motor Co. v. Maddox*, 486 S.W.3d 838, 844 (Ky. 2015), *as modified on denial of reh'g* (Ky. 2016). Thus, Tertin's analysis of the P320 and its competitors was appropriate and relevant. For these same reasons, Vigilante's reliance on similar evidence was also appropriate. *See* R. 40-5 (Vigilante Report at 4–5, 16–19, 28–32) (Page ID #819–20, 831–34, 843–47).

Furthermore, to the extent that the experts relied on evidence of similar inadvertent shootings from P320 users—like Vigilante's reliance on YouTube videos and the ICE Memorandum—such reliance was not inappropriate. Under Kentucky law "[g]enerally, 'evidence of the occurrence or nonoccurrence of other accidents or injuries under substantially similar circumstances is admissible when relevant to . . . the existence or causative role of a dangerous condition, or a party's notice of such a condition.'" *Primal Vantage Co.*, 677 S.W.3d at 237 (ellipsis in original) (quoting *Montgomery Elevator Co. v. McCullough ex rel. McCullough*, 676 S.W.2d 776, 783 (Ky. 1984)). If Davis could rely on substantially similar incidents as evidence of the P320's alleged dangerousness and defective design, we see no reason why experts opining on the P320 could not rely on that same evidence. If evidence of substantially similar incidents is appropriate and reliable enough for the jury when relevant, then it would be similarly appropriate and reliable for the expert witness. Accordingly, it was acceptable for Tertin and Vigilante to rely on this evidence in concluding that the P320 is at an elevated risk of inadvertent actuation when compared to competitor pistols.

Third, the experts' testimonies are "the product of reliable principles and methods." Fed. R. Evid. 702(c). The district court did not address the experts' principles and methods in the first instance, nor did Sig Sauer move to exclude the experts based on their principles and methods.

*See* R. 39 (Mot. to Exclude Tertin at 15) (Page ID #549) (arguing to exclude Tertin's methodology as applied to the facts); R. 40 (Mot. to Exclude Vigilante at 17–18) (Page ID #776–77) (arguing to exclude Vigilante's methodology as applied to the facts). There is no evidence in the record that gives reason to doubt that both Tertin and Vigilante employed reliable principles and methods in analyzing the P320, its competitors, and reasonable alternative designs. Both Tertin and Vigilante are experts in their fields with decades of experience. Sig Sauer has given us no reason to doubt that Tertin's disassembling and studying an exemplar P320 or comparing it to direct competitors was inappropriate. *See* R. 39-6 (Tertin Report at 1) (Page ID #688). Similarly, Vigilante lists the principles applied in his report, and Sig Sauer has provided no rationale for questioning those principles. *See* R. 40-5 (Vigilante Report at 4) (Page ID #819).

Finally, the experts' opinions "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Tertin and Vigilante studied the P320 and relevant competitors, and they considered what allegedly makes the P320 unreasonably dangerous and defective. The design of the P320, reasonable alternative designs, and the designs of competitor pistols are all facts relevant to this case under Kentucky law. Furthermore, Tertin and Vigilante considered other incident-specific facts relevant to the case. Their opinions rest on the assumption that Davis's gun fired inadvertently while fully holstered. This assumption has evidentiary support. Any evidence to the contrary goes to "the weight of the evidence, rather than to its admissibility." *In re Scrap Metal*, 527 F.3d at 530; *see also McLean*, 224 F.3d at 801. Tertin assumed that "the firearm discharged a 9mm hollow point round while in its holster." R. 39-6 (Tertin Report at 3) (Page ID #690). Similarly, Vigilante assumed that Davis's "holstered P320 X-Carry pistol unintentionally discharged." R. 40-5 (Vigilante Report at 8) (Page ID #823). Both Tertin and Vigilante drew on Davis's deposition testimony in making this factual assumption.[5] R. 39-6 (Tertin Report at 2) (Page ID #689); R. 40-5 (Vigilante Report at 4) (Page ID #819). This assumption is consistent with Davis's deposition, wherein he testified that the gun was "lock[ed] in . . . when the gunshot [went] off." R. 41-1 (Davis Dep. at 64:8–10) (Page ID #982). He "remember[ed] specifically because the leather [holster] lock ha[d] a

---

[5]Vigilante also relied on the police report that "[t]he weapon still had the spent shell casing in the chamber" in finding that Davis's testimony was "[c]onsistent" with other record evidence. R. 40-5 (Vigilante Report at 8) (Page ID #823).

locking mechanism inside it," that he could feel. *Id.* (Davis Dep. at 64:6–8) (Page ID #982). Counsel for Sig Sauer asked if this was in fact Davis's recollection of the incident: "So you had fully locked [the gun] into the holster and started to move before it fired?" *Id.* (Davis Dep. at 64:11–12) (Page ID #982). Davis confirmed that this was his recollection. *Id.* (Davis Dep. at 64:13) (Page ID #982). This is sufficient record evidence on which to assume that Davis inadvertently fired his P320 while the gun was fully holstered. Contradictory evidence goes to the weight, rather than the admissibility, of the expert testimonies.

For all these reasons, we hold that both experts' opinions are admissible to demonstrate design defect and reasonable alternative design.

## B. Summary Judgment

Because we vacate in part and reverse in part the district court's evidentiary rulings, we cannot affirm the district court's order on summary judgment based on its finding that Davis lacks expert testimony in support of his claims. We hold that, in light of the specific expert testimony provided and the peculiar factual circumstances of this case, Davis may proceed to trial on his design-defect claims. We thus vacate the district court's grant of summary judgment.

We review de novo a grant of summary judgment, construing the evidence "in the light most favorable to the nonmoving party . . . ." *Helphenstine v. Lewis County*, 60 F.4th 305, 314 (6th Cir. 2023) (quoting *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017)). A grant of summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" exists if the nonmoving party presents "sufficient evidence from which a jury could reasonably find" in its favor. *Troutman v. Louisville Metro. Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020) (quoting *Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 835 (6th Cir. 2012)).

After completely excluding Tertin's and Vigilante's opinions, the district court granted summary judgment because Davis could not pursue his products-liability case without expert evidence. *Davis*, 2024 WL 54595, at *4–5. Because we reverse the district court's ruling as to admissibility, this rationale no longer applies. The experts' opinions are helpful precisely

because they explain to the jury the inner workings of the P320 and how its design may be unreasonably dangerous.  We acknowledge that Kentucky law may require "[e]xpert testimony . . . in cases in which the question is of a complex and technical nature such that a lay juror could not, without the aid of the expert, infer that a defective condition of the product caused the product's failure and caused the injury to the plaintiff."  *Stevens v. Keller Ladders*, 1 F. App'x 452, 458 (6th Cir. 2001); *see also Burgett v. Troy-Bilt, LLC*, 970 F. Supp. 2d 676, 681 (E.D. Ky. 2013); *Templeton v. Wal-Mart Stores E., LP*, No. 08-169, 2011 WL 4591937, at *3 (E.D. Ky. Sept. 30, 2011); *Honaker v. Innova, Inc.*, No. 1:04–CV–132(M), 2007 WL 1217744, at *2 (W.D. Ky. Apr. 23, 2007).  However, expert evidence is unnecessary where a juror "through common knowledge or experience," can understand "the intricacies involved in the [] claim."  *Caniff v. CSX Transp., Inc.*, 438 S.W.3d 368, 374 (Ky. 2014); *Burgett*, 970 F. Supp. 2d at 681 ("Kentucky law does not expressly predicate recovery on the introduction of expert testimony." (citing *Robbins*, 421 S.W.2d at 824)).  The only complex issue in this case that falls outside the realm of the lay juror is whether there is any defect in the design of the P320 and whether any reasonable alternative safer designs exist, and Tertin and Vigilante fulfill Davis's obligation in this regard.

This case is not extraordinarily complex.  In particular, expert testimony is unnecessary to determine causation in this case.  Whether Davis inadvertently pulled the trigger through either a side-pull or a graze, and whether any of the safety mechanisms described by Tertin and Vigilante would have prevented the gunshot, are not complex questions that require expert testimony.  Undoubtedly, the inner workings of the P320 are complex and an expert is necessary to explain those complexities.  Once the P320's design and functioning is explained, however, the question of whether Sig Sauer's design choices substantially factored into Davis's trigger actuating in such a way that one of the proposed alternative safeties would have been effective is not complicated.  A juror can assess Davis's veracity concerning how the discharge occurred and contrast it with the police report, witness testimonies, and the physical evidence.  This is not a "mass of evidence" that a juror would have to ignore to find in favor of Davis, as the dissent suggests.  *See* Dissent at 27.  Instead, this is a classic dispute of fact most appropriate for the trier of fact to resolve.  Based on this evidence, applying common-sense principles, a juror could adequately reason whether the P320's lack of an external safety mechanism as described by Davis's experts was a substantial factor in bringing about the gunshot injury.  This type of

simple, common-sense reasoning fits squarely within the realm of the trier of fact. This is like *Caniff*, where the Kentucky Supreme Court held that expert evidence was unnecessary for the plaintiff to prove his negligence theory after he was injured while performing specialized railroad-repair work. 438 S.W.3d at 370, 374 ("Here, the duty, breach, foreseeability, causation, and injury which Caniff must prove . . . can be readily understood by the jury without the aid of an expert witness," by reference to his deposition and other evidence.).

A juror applying his or her own common sense could assess whether Davis pulled the trigger of his P320 in such a way that a tabbed trigger or grip safety could have prevented the inadvertent gunshot.[6] Davis testified that he did not pull the trigger and that the gun was fully holstered. R. 41-1 (Davis Dep. at 64:6–13) (Page ID #982). The un-ejected shell casing supports this testimony. R. 41-2 (Police Report at 3) (Page ID #986). Sig Sauer hired an expert to dispute Davis's recollection of the incident, *see* R. 41-11 (Watkins Report at 15–22) (Page ID #1227–34), and also points to a police report that states that Davis was "attempting to" but had not fully holstered his gun when he shot himself, R. 41-2 (Police Report at 3) (Page ID #986). Whether Davis shot himself by fully depressing the trigger (which would not have been prevented by any of Davis's proposed alternative designs) or whether Davis inadvertently shot himself through a graze or a side-pull (which the alternative designs would have prevented) is a classic genuine dispute of material fact that should be left to the trier of fact. The trier of fact must decide under what factual circumstances Davis was shot, whether the P320's design substantially factored into the resulting injury, and whether any of the alternative designs are reasonable and would have prevented the incident.

This holding fits neatly in Kentucky's approach to proving causation in tort cases, including in products-liability cases, on summary judgment. Kentucky courts do not, in every circumstance, require plaintiffs to introduce expert evidence on legal causation to demonstrate a genuine issue of material fact. "[L]egal causation[] presents a mixed question of law and fact."

---

[6]The dissent argues that one way in which Davis's experts could have helped the jury make this decision would have been "by running tests with different guns and determining whether the P320 is more likely to fire than other guns with a tabbed trigger . . . ." Dissent at 32. Tertin performed this exact test. *See* R. 49-18 (Tertin Tabbed Trigger Videos) (Page ID #2574). Davis provided the panel with Tertin's videos that demonstrate various angles of side pulls and grazes that actuate a P320 but not a Glock that has a tabbed trigger.

*Pathways, Inc.*, 113 S.W.3d at 89. "Legal causation presents a question of law" susceptible to summary judgment only when "there is no dispute about the essential facts and [only] one conclusion may reasonably be drawn from the evidence." *Id.* at 92 (quoting *McCoy v. Carter*, 323 S.W.2d 210, 215 (Ky. 1959)). "Therefore, whether a plaintiff's damage was caused by the tort defendant typically 'should be left to the jury to determine.'" *Stathers*, 405 S.W.3d at 479 (quoting *Eichstadt*, 337 S.W.2d at 686). "It is not surprising then that, with the exception of medical malpractice cases, [the Kentucky appellate court] could find no Kentucky appellate opinion affirming any grant of summary judgment based on a plaintiff's inability to establish, through expert testimony, the existence of a genuine issue of the material fact—in this case, a genuine issue regarding causation." *Id.* at 479–80. Because Kentucky courts do not require expert evidence to prove causation—at least outside of a medical-malpractice claim—we see no reason to apply a heightened standard here.[7] For all the reasons we have already explained, although Davis needs Tertin and Vigilante to show any defect in the design of the P320 and how it may be designed more safely, Davis does not need Tertin or Vigilante to explain how that alleged defect caused his particular injury. The underlying question of how Davis inadvertently actuated his P320 is a simple factual dispute that is inappropriate for summary judgment because it is disputed and must be resolved by the trier of fact.

Accordingly, we vacate the district court's grant of summary judgment and remand for further proceedings.

---

[7]The dissent takes this sentence out of context and misconstrues our holding. *See* Dissent at 28. We recognize that in complex cases expert evidence is necessary. The caselaw is clear and our analysis reflects this point. As the dissent agrees, expert testimony is not required to prove causation in a tort case "unless of course the nature of the defect and resultant injuries are so obvious as to fall within the general knowledge of the ordinary person." *See id.* (quoting William S. Haynes, Kentucky Jurisprudence: Torts § 21–18 (1987)). The dissent primarily relies on a treatise to support its position that expert testimony on causation is required in this case. *See id.* at 28–29 (quoting or citing the Haynes treatise three times). An out-of-date treatise binds neither this court nor any Kentucky court. In any event, we could not identify a Kentucky Supreme Court decision that expresses the proposition that expert testimony on causation is required here. Perplexingly, the section of the treatise on which the dissent relies offers only conclusory propositions without support. *See* Haynes, *supra*, § 21-18. We are not convinced to stray from binding state-court precedent and the recent survey of the law conducted by the Kentucky Court of Appeals.

## C. Out-of-Circuit Decisions

We conclude by noting that our holding is in accord with rulings from other district courts across the country addressing similar testimonies provided by Tertin and Vigilante in other P320 design-defect cases. Many of these cases are pending on appeal in our sibling circuits, and we see little potential for conflict with other decisions.

The very first district court to address the admissibility of Tertin's and Vigilante's expert opinions reached the same legal conclusion that we do. In *Herman v. Sig Sauer Inc.*, a district court in in the Western District of Oklahoma found that the opinions of Tertin and Vigilante were inadmissible to prove causation, but admissible to prove design defect generally, after the plaintiff suffered an injury from an inadvertent discharge that occurred while the plaintiff was attempting to take his P320 out of his holster. No. 5:21-cv-1038-R, 2023 WL 5827054, at *1–4 (W.D. Okla. Sept. 8, 2023). As *Herman* recognizes, a plaintiff does not need an expert to prove causation if there is sufficient record evidence from which a reasonable juror could conclude that an alleged defect in the P320 caused the injury. *See id.* at *6. *Herman* agrees with our position that, where experts are permitted to opine on design defect but excluded from opining on causation, a design-defect products-liability claim rises and falls on the circumstantial evidence a plaintiff has marshaled in support of causation.[8] In this case, Davis has introduced testimonial evidence that the P320 was fully holstered when it fired and physical evidence from the un-ejected shell-casing from the P320 in support of his position that the gun was fully holstered when it fired. Sig Sauer has introduced conflicting testimonial evidence and an alternative explanation for the un-ejected shell-casing. This is a genuine dispute of material fact proper for a trier of fact to resolve.

---

[8]Two other district court opinions largely track *Herman*'s rationale. *See Slatowski v. Sig Sauer, Inc.*, No. CV 21-729-RBS, 2024 WL 1078198, at *6–8 (E.D. Pa. Mar. 12, 2024); *Colwell v. Sig Sauer, Inc.*, No. 1:21-cv-1200 (BKS/ML), 2024 WL 4216047, at *3–6 (N.D.N.Y. Sept. 17, 2024). In both *Slatowski* and *Colwell*, neither plaintiff presented any physical evidence corroborating his testimony that the P320 inadvertently discharged while fully holstered such that a reasonable juror could conclude that the P320 was actuated by a side-pull or graze that an external safety would prevent. *Colwell*, 2024 WL 4216047, at *8 ("Plaintiffs cannot establish through expert testimony or circumstantial evidence the essential element of causation with respect to their strict products liability and negligence causes of action."); *see also Slatowski*, 2024 WL 1078198, at *1–2 (describing evidence that gun was outside the holster when actuated).

The next district court to address admissibility permitted Vigilante's and Tertin's testimonies. *See Lang v. Sig Sauer, Inc.*, No. 1:21-cv-4196-ELR, ECF No. 46, (N.D. Ga. Sept. 28, 2023). The plaintiff in *Lang* accidentally shot himself with his P320 as he was removing it from its holster. *Id.* at 1. Similar to our case, the plaintiff had hired Tertin and Vigilante to prove his theory that the P320 is defectively designed. *Id.* at 9–15. The district court limited the scope of the experts' testimonies, while not excluding them in their entireties. The district court found that neither Tertin nor Vigilante could testify that a manual trigger safety would have prevented the plaintiff's injury because the plaintiff had testified that he would not use this safety feature, even if the P320 had it. *Id.* at 24. The district court found that Tertin and Vigilante could testify that a tabbed trigger safety would have prevented the plaintiff's injury. *Id.* at 25–31. The district court noted that the experts' opinions were admissible precisely because they had explained how the plaintiff's P320 may have actuated from a side-pull, graze, or inertia and that a tabbed trigger could prevent inadvertent discharges in these circumstances. *See id.* at 27–28. This decision tracks the rationale of our decision. Ultimately, a jury returned a verdict in the plaintiff's favor in the amount of $2,350,963. *Lang v. Sig Sauer, Inc.*, No. 1:21-cv-4196-ELR, 2024 WL 3744720 (N.D. Ga. June 20, 2024).

Similarly, a district court in the District of Massachusetts permitted the expert opinions of Tertin and Vigilante. *Catatao v. Sig Sauer, Inc.*, No. 1:22-cv-10620-PBS, ECF No. 94 (D. Mass. June 24, 2024); *Catatao v. Sig Sauer, Inc.*, No. 1:22-cv-10620-PBS, ECF No. 95 (D. Mass. July 9, 2024). In *Catatao*, the plaintiff's P320 inadvertently actuated when her keys accidentally depressed the trigger of her holstered P320. 2024 WL 4011973, at *1 (D. Mass. July 9, 2024). The district court admitted Tertin's testimony—despite the fact that he testified that he had no opinion as to what actually caused the inadvertent discharge—because Tertin concluded that the P320 was defectively designed and that a trigger safety probably would have prevented the plaintiff's injury. *Catatao*, No. 1:22-cv-10620-PBS, ECF No. 94 at 4–5 (D. Mass. June 24, 2024). As for Vigilante, the district court found that his conclusions were the product of a reliable methodology reliably applied to the facts of the case. *Catatao*, No. 1:22-cv-10620-PBS, ECF No. 95 at 6–7 (D. Mass. July 9, 2024). This case is set for trial in January 2025. *Catatao*, No. 1:22-cv-10620-PBS, ECF No. 104 at 1 (Oct. 7, 2024).

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM IN PART**, **REVERSE IN PART**, **VACATE IN PART**, and **REMAND** for proceedings consistent with the foregoing analysis. We affirm the district court's order precluding Tertin and Vigilante from opining on causation, but we reverse the district court's order precluding their expert testimonies in their entireties. We hold that Tertin and Vigilante may properly testify about potential design defects in the P320. Finally, we vacate the district court's grant of summary judgment and remand for further proceedings.

———————————

**DISSENT**

———————————

THAPAR, Circuit Judge, dissenting. Timothy Davis bought a firearm without a safety. The parties disagree on what happened next. Davis, for one, says the gun fired on its own, sending a bullet into his leg. So he sued, arguing the lack of safety made the pistol defective. In a complex product defect case, Kentucky requires a plaintiff to present expert testimony showing both that there's a defect and the defect caused his injury. But Davis didn't present expert testimony on causation. Thus, his product defect claim should fail. Because the majority says it should go forward, I respectfully dissent.

I.

This case comes down to one issue: whether a pistol's lack of a safety caused Davis's injury. This is a hard question to answer. It involves both psychology—whether someone who buys a gun without a safety would use the safety—and real-world events, like whether a particular safety would prevent a particular accident. Understanding why it's a hard question requires a discussion of the gun and the events surrounding the shooting.

A.

Start at the beginning. Davis bought and carried a Sig Sauer P320 X-Carry without a manual safety. Davis was free to make that reasonable choice. But it should defeat his claim that the gun suffered from a design defect that caused him injury.

The Sig Sauer P320 is a popular modular handgun. Depending on how you count, Sig Sauer makes about ten P320 variants. And, on top of those versions, consumers can swap out parts and accessories to craft the firearm that best serves their needs. Such modifications can help the gun fire different rounds, accept different grips, and add optics like a red dot sight. The P320, in other words, allows an informed consumer to buy the exact weapon he wants.

Sig Sauer offers P320 customers the choice to buy variants with or without a "manual safety." Typically, that's a switch on the pistol's side that a user can flip with his thumb. If the

switch is in "fire mode," the gun will discharge when someone pulls the trigger. If it's not in fire mode, the gun won't shoot. Several P320 models have such a switch. For example, the P320 M17, which won the United States Military's Modular Handgun Systems trials and is now standard-issue in the U.S. military, has a manual safety. Other versions of the P320, such as the X-Carry, P320 Full, or P320 X-Five Legion, don't.

Sig Sauer is wise to offer this range of products. Many consumers don't want a manual safety. Why? Because they may have to use their gun to protect themselves. A person facing imminent danger doesn't have the time to draw his weapon, remember to release a manual safety, disengage the safety, aim, and fire. As common sense suggests, there's no time for additional steps during a crisis. Thus, many citizens with concealed weapons don't use a safety at all. Without a manual safety, a person can simply draw, point, and shoot.

This isn't a modern innovation. Citizens have long relied on such guns to defend themselves. Indeed, the first concealed guns like the English Queen Anne pistol lacked safeties. Likewise, early Colt self-loading pistols, which the Army used at the turn of the twentieth century, didn't have a safety. All told, for centuries, law-abiding citizens have reasonably concluded that they don't want to fumble with a safety catch when seconds count. They need to use those precious moments to protect their families from danger.

Here, all signs show that Davis recognized this tradeoff and chose to do what millions of Americans have done: buy a gun without a safety. How so? Davis admitted that he wasn't "specifically looking for [a thumb safety] in a pistol." R. 41-1, Pg. ID 979. And he was aware that the P320 didn't have a safety. Thus, he knowingly bought a gun without one. And, in doing so, Davis got what he bargained for—he could fire the gun more quickly and better protect himself in a crisis.

But now Davis sues. He argues that his informed purchase isn't relevant; he alleges the gun was simply too dangerous in the first instance.

In arguing that he should recover, Davis faces an uphill battle. Why? For one, he ignores a long history of individuals carrying guns without a safety for personal protection—which counsels against finding that a gun without a safety is defective. But even more important, his

argument implicates a tough causal question. He asks us to find that a man who knowingly bought a gun without a safety would have had that safety engaged and wouldn't have been injured—despite the drawbacks of using that feature while carrying.[1]

B.

Next, consider the day of the shooting. To begin, the facts here are murky. All that's know for sure is that in January 2021, as Plaintiff Timothy Davis exited his truck, his P320 X-Carry pistol fired, sending a 9mm hollow-point round into his leg.

Davis tells a simple story: He claims he wasn't doing anything that would have made the gun go off. As he tells it, the pistol was fully holstered at the time of the shooting. Thus, he didn't pull the trigger.

That's a convenient account, and potentially a good one. After all, if the gun fired while holstered, that shows there may be something wrong with the P320 X-Carry.

But Davis omits some details. According to a police officer who responded to the shooting, Davis said that the pistol discharged when "he was attempting to holster" the gun. R. 41-2, Pg. ID 986. In other words, the gun was in his hand when it went off. An eyewitness had a similar recollection, later testifying that the pistol was in Davis's hand—not holster—when the discharge occurred. And an EMT at the scene wrote that Davis explained that he was "going to put his gun in the holster on his hip when he accidentally shot himself with a 9mm hollow point. [Davis] went on to explain that he felt like had a stressful day and was not as careful as normal." R. 41-3, Pg. ID 989. The "stress" the EMT referred to that day was that Davis's wife had just asked him to move out so that she could leave him. All told, a mass of evidence suggests the gun didn't fire on its own. Instead, it suggests that Davis fumbled with his gun and pulled the trigger.

---

[1]I agree with the majority that under Kentucky law, a design can be defective such that it is unreasonably dangerous. *See Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980). But the product defect must also *cause* the injury. *Caniff v. CSX Transp., Inc.*, 438 S.W.3d 368, 374 (Ky. 2014). Given that Davis did what thousands of Americans do each year—buy a gun without a safety to better protect himself—the individual facts of this case are highly relevant to assess causation.

Of course, it's the factfinder's job to sort out what happened in a particular case. But the summary judgment briefing reveals significant questions about what caused Davis's gun to discharge in the first place.

## II.

Summary judgment is appropriate in design defect cases when the plaintiff fails to present expert evidence about how the alleged design defect caused his injury. In Kentucky, "[e]xpert witnesses are generally necessary, indeed essential, in products liability cases . . . to prove such matters as a product defect and proximate causation, unless of course the nature of the defect and resultant injuries are so obvious as to fall within the general knowledge of the ordinary person." William S. Hanes, Kentucky Jurisprudence: Torts § 21–18 (1987); *accord Stevens v. Keller Ladders*, 1 F. App'x 452, 458 (6th Cir. 2001). Thus, if a defect and injury isn't "so obvious," then a plaintiff needs to provide expert testimony about why the defect caused the injury.

Here, Davis's claims hinge on complex causal determinations, but his expert testimony falls short. Accordingly, his claims should not survive summary judgment.

The majority opinion's arguments to the contrary aren't convincing. The majority, for its part, reasons that because "Kentucky courts do not require expert evidence to prove causation— at least outside of a medical-malpractice claim"—there's "no reason" to require expert testimony here. Maj. Op. at 26. The majority cites a line of state intermediate appellate court cases suggesting that Kentucky only requires expert testimony on causation in the medical malpractice setting. *Id.*; *see, e.g.*, *Stathers v. Garrard Cnty. Bd. of Educ.*, 405 S.W.3d 473, 479 (Ky. Ct. App. 2012). But that is wrong.

For one, the majority's reading contradicts Kentucky Supreme Court precedent. The Kentucky Supreme Court has stressed the need for expert testimony "in complex cases." *Caniff v. CSX Transp., Inc.*, 438 S.W.3d 368, 374 (Ky. 2014); *see also* Hanes, Kentucky Jurisprudence: Torts § 21–18 ("As a general rule, expert witnesses are generally necessary, indeed essential, *in*

*products liability cases*, as they are in medical malpractice actions," to prove causation (emphasis added)).[2]

And when the two conflict, it's the Kentucky Supreme Court that controls, not the Kentucky courts of appeals. After all, that state's "highest court is unquestionably the 'ultimate exposito[r] of state law." *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Here, that principle means courts look to what the Kentucky Supreme Court has held: that experts are necessary in complex cases.

What's more, properly read, the Kentucky court of appeals decisions support requiring expert testimony in complex cases like this one. Indeed, the majority cites cases that deal with simple fact patterns: whether blasting damaged one's home. *See Stathers*, 405 S.W.3d at 476. In *Stathers*, for instance, just a few weeks after a couple bought a new home, a nearby construction company used enough explosives to cause a series of "huge blast[s]" that shook the entire home, leading to fresh cracks in the home's walls. *Id.* at 476–78. The court explained that the couple didn't need an expert to testify that the nearby detonation of large explosives caused the damage. *See id.* at 479–81. Other cases involving similarly simple disputes come out the same way. *See, e.g.*, *River Queen Coal Co. v. Mencer*, 379 S.W.2d 461, 463–64 (Ky. 1964); *Bradford v. Sagraves*, 556 S.W.2d 166, 167–69 (Ky. Ct. App. 1977). What do these cases tell us? Plaintiffs with an obvious causal claim don't need expert testimony. After all, a juror doesn't need Robert Oppenheimer to tell them that blowing up explosives may damage a building.

But such a simple situation doesn't control when a plaintiff asks the juror to make judgments about complex causal issues. In such a situation, Kentucky courts require expert testimony. *Caniff*, 438 S.W.3d at 374; *see also* Hanes, Kentucky Jurisprudence: Torts § 21–18.

---

[2]While the majority says that it recognizes "that in complex cases expert evidence is necessary," Maj. Op. at 21 n.7, it then rejects not only the Hanes treatise but the conclusion that expert testimony is necessary here. *Id.* In doing so, it relies on state intermediate court decisions addressing straightforward causation inquiries like whether detonating explosives can damage a home. *Id.* at 19–21. However, not only does Kentucky Supreme Court precedent explain that in complex cases courts should look for expert testimony, but as explained below, state intermediate court precedent addressing simple cases doesn't inform how courts should decide the complicated ones.

And that is the case here: a juror would have no idea whether a particular safety would have prevented Davis's gun from going off.

## A.

Start with Davis's expert testimony. As the majority correctly points out, neither Tertin nor Vigilante could say why the accident occurred. Instead, they made general claims about design and conclusory statements about causation.

First, consider Tertin. His report and testimony are generic: Tertin didn't even reconstruct the accident at issue. What's more, he admitted he had "no scientific evidence that would prove that" a lack of a safety caused Davis' pistol to discharge. R. 39-1, Pg. ID 576. And Tertin agreed he didn't "have information one way or the other as to how either Mr. Davis'[s] finger or a foreign object depressed [the] trigger." *Id.* He instead relied on "common sense" to say that his proposed safety mechanisms would have prevented the firing at issue. *Id.* Despite this lack of evidence, Tertin (somehow) concluded that a particular safety "probably would have prevented" the shooting. *Id.*

Vigilante's testimony also sounds in generalities, with no foundation for reaching a conclusion on causation. Vigilante explained he didn't know what pulled the trigger and thus caused Davis's pistol to fire. He didn't even inspect Davis's P320 pistol. But he nonetheless concluded "[h]ad Sig Sauer integrated a manual safety . . . Timothy Davis would not have been injured." R.40-5, Pg. ID 847. Like Tertin, Vigilante opined on what caused Davis's accident without a factual basis for doing so.

All told, the majority is right that Tertin and Vigilante's testimony lacked reliable factual bases for their opinions about causation. The district court was therefore correct to exclude their testimony on that issue.

## B.

Thus, Davis is left with no expert testimony on causation. And under Kentucky law, if a plaintiff presents no expert testimony showing how a defect caused the accident or injury at issue, his claim fails unless the defect and injury are "so obvious" as to fall within general

knowledge.  Hanes, Kentucky Jurisprudence: Torts § 21–18 (1987).  So how do Davis's claims stack up?

It depends on how you frame his claims.  On the one hand, the majority believes that causation rests on a straightforward factual dispute:  Was the gun fully holstered when it discharged?  Or was Davis trying to holster the gun when it fired?  Majority Op. at 25.  For the majority, this dispute is everything:  If the gun was fully holstered when it discharged, then one of Davis's proposed alternative designs would've prevented the shooting.  But if Davis was holstering the gun and fully depressed the trigger, then the alternative designs wouldn't have prevented the shooting.  *Id.* at 25–26.  Of course, this framing is easy for a jury to follow—it just requires a bread-and-butter determination of the underlying facts.

On the other hand, though, whether a particular safety could've prevented a given accident is a hard question.  Why?  It requires inquiring into how safeties would work in a particular case.  Davis must show that, even if his version of events is to be believed, a safety would've prevented the accidental discharge.  Davis argues that three specific safeties—a tabbed trigger, grip safety, and thumb safety—would have made this shooting less likely.  Framed this way, the causation analysis is highly technical.  For one, it turns on engineering knowledge—the amount of pressure and type of motions that cause a safety to disengage.  It also means a factfinder must understand psychology, asking whether individuals would even have a particular safety engaged.  Such an inquiry generates a long list of complex questions, including:  Would a tabbed trigger prevent a gun from firing under identical circumstances?  Would a grip safety prevent firing even if the motion at issue would otherwise set off the gun?  Would a thumb safety be useful if an owner probably wouldn't have engaged it in the first place?  These are tough queries, and they don't fit within an ordinary juror's knowledge.

So which framing is best?  This court should use the more complex framing, since Davis's claim that a different design would've prevented his injury isn't sufficient to establish liability.  *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 70–71 (Ky. 1973).  A complex design defect case requires more than the "conclusory" statement that a safety would've made it harder to fire the gun.  *Ingersoll-Rand Co. v. Rice*, 775 S.W.2d 924, 928 (Ky. Ct. App. 1988), *abrogated on other grounds as recognized in Con'tl Marine, Inc. v. Bayliner Marine Corp.*, 929 S.W.2d

206, 207 (Ky. Ct. App. 1996). Indeed, analyzing each of the three safeties reveals that he's asking a jury to make complex determinations about what caused this particular shooting, and what would happen if the gun had a different design. And those require expert testimony. Hanes, Kentucky Jurisprudence: Torts § 21–18.

1.

Start with a tabbed trigger. A tabbed trigger, what Tertin calls a "trigger safety," is essentially a small lever built into a gun's regular trigger. The user must press both the tab and trigger simultaneously to fire the weapon. Tertin says these features prevent accidental shootings because they make it hard for a gun to fire unless the user's finger is firmly wrapped around the middle of the trigger.

While the tabbed trigger sounds simple enough, evaluating how it might function in any instance is hard. For example, it requires asking if the same graze that fired a gun without a safety would fire the gun with a safety.

An ordinary juror would struggle to answer this question without expert help. Why? For one, Davis conceded as much at oral argument, noting that expert testimony is necessary to understand his claim that a tabbed trigger would've prevented the shooting. And Davis's experts add nothing on this point. Tertin, for example, admitted he didn't know of any studies proving that a tabbed trigger prevents discharges. And, since Davis's gun fired, *something* must have pulled the trigger—be it an accidental "side pull," a graze, or clothing caught in the trigger guard. An ordinary citizen is not equipped to determine whether a tabbed trigger would have prevented any or all of those from occurring in Davis's situation. That's an intricate question of product design and causation, even for people with a working understanding of firearms. Thus, asking a jury to decide such a question without expert testimony is a tall order.

Here, expert testimony would help a jury make its decision. An expert could bring clarity by running tests with different guns and determining whether the P320 is more likely to fire than other guns with a tabbed trigger in the precise circumstances at issue.[3] After all, this kind of

---

[3]Here, despite the majority's insistence that Tertin ran similar tests, Maj. Op. at 20 n.6, Tertin did not perform an incident-specific analysis. Instead, Tertin's tests showed that if you contact a tabbed trigger in a way

evidence gives a jury context about how products function and whether they cause injury. *Cf. Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 40 (Ky. 2004), *as amended* (June 14, 2004). Experts could also provide evidence on why Davis's gun may have fired. Such information would allow a jury come to an informed conclusion about the shooting here.

But without such evidence, we're asking the jury to make the kind of complex causal determination that Kentucky law says it can't. *Caniff*, 438 S.W.3d at 374. Evaluating a tabbed trigger, while simple at first glance, requires a jury to analyze several complex arguments that implicate firearms design and causation.

2.

The grip safety fares no better. In brief, a grip safety is a lever on the back of a firearm. It forces the owner to hold the weapon so that the switch presses against his palm as he points and shoots. Tertin explains that this type of safety requires "[v]irtually no extra effort on the part of the user, because their hand would naturally depress the safety as they were holding the pistol." R. 39-6, Pg. ID 700. In other words, the grip safety supposedly makes a gun safe because it ensures that the weapon fires only when it's in a user's hand.

As with the tabbed trigger, this supposedly simple question masks a complex determination. The jury would have to speculate about how a particular grip safety would function in Davis's situation. The jury would have to guess whether Davis's motions would have triggered the grip safety and what motions might yield accidental actuation. And that's precisely the kind of "speculation or surmise" that Kentucky courts seek to avoid in products liability cases. *Midwestern V.W. Corp. v. Ringley*, 503 S.W.2d 745, 747 (Ky. 1973). Kentucky law doesn't task the jury with guesswork. *See* Hanes, Kentucky Jurisprudence, § 21–18.

---

that avoids depressing the tab, the pistol won't fire. That tells a jury nothing about what happened. It isn't the kind of expert testimony helpful in complex cases like this one. By contrast, Sig Sauer's expert conducted extensive incident-specific analysis that considered how specific movements and actions would make a gun fire. *See* R. 41-11, Pg. ID 1218–24. That evidence is useful—Tertin's is not.

Expert testimony could help a jury make that determination.[4]  How?  An expert could explain how hard it is to depress a grip safety on a P320-X.  Does it take one pound of force?  What about five pounds?  An expert could also provide evidence about what kinds of motion could inadvertently cause a gun to fire without compressing a grip safety.  And he could explore whether Davis made such motions when stepping out of his car.  This information would help a jury arrive at a reasoned conclusion—rather than just engaging in guesswork.

3.

Finally, consider the thumb safety.  A thumb safety is a small switch on a pistol's side that a user can toggle on or off.  It's what probably comes to mind when a reader thinks of a safety—a small switch a user flips before his gun will fire.

And like the other two safeties that Tertin and Vigilante discussed, the thumb safety presents a deceptively simple causal argument.  After all, if there's a safety, wouldn't that make it harder to shoot?

While a safety makes a gun harder to shoot, that generalization shouldn't end our analysis.  After all, how does the jury know that Davis would've had the thumb safety engaged at the time of the accident?  So, by reversing summary judgment here, we're asking the factfinder to consider whether a man who knowingly bought and carried a gun without a thumb safety would have used the safety if his gun had one.  That's an inquiry that involves "human factors." *See, e.g.*, *Spencer v. Playtex Prods., Inc.*, No. 2006-CA-000995-MR, 2007 WL 2343768, at *1 (Ky. Ct. App. Aug. 17, 2007).  And, as "human factors" literature acknowledges, such a question involves a complicated interdisciplinary analysis of human behavior, product design, psychology, and safety.  That's the stuff of expert testimony, not ordinary knowledge.  Indeed, Davis implicitly acknowledges as much.  He hired Vigilante, a psychologist and human factors expert, to explain why his gun fired.  And, while Davis's hiring an expert isn't dispositive, it reflects the reality of the argument he makes:  He's asking a factfinder to determine that Sig

---

[4]What's more, Sig Sauer presents evidence a tabbed trigger wouldn't have prevented this shooting, as the company's expert suggests that no motion would lead the P320-X to fire while holstered.

Sauer's P320-X's design interacted with human behavior such that it caused Davis's specific injury.

And when distilling those theoretical qualms and apply them to the facts here, the picture remains murky. Davis bought a gun without a safety. And individuals often don't use safeties when they carry. Thus, it makes little sense to conclude that a jury could easily find Davis would have carried the same gun with a safety engaged. There's no basis for that conclusion, particularly given that people buy the P320 precisely because it doesn't have a safety. What's more, even if the jury could conclude that Davis would've used a safety (despite purchasing a gun without one), his movements still could've caused the safety to disengage. But without expert testimony, any analysis about these human factors or physical movements would be both pure speculation and far from the common knowledge of the ordinary person. *See Ringley*, 503 S.W.2d at 747.

Thus, even for the thumb safety, Davis needed to provide expert testimony showing that the P320's lack of a safety caused his injuries. A human factors analysis could provide testimony on how a user might have acted. But Davis's human factors expert didn't do that. So Davis's claim should fail.

*

In sum, whether Davis needed expert testimony to survive summary judgment depends on how one considers the questions at issue. If a court asks only whether Davis had the gun holstered, it might make sense to let a jury make up its own mind. But this case concerns deeper questions. It involves whether three specific safeties, placed in the context of this incident, would have prevented Davis's shooting. And pursuing those inquires requires analyzing complex issues about gun design and user psychology. Jurors aren't equipped—or allowed—to do that without expert assistance.

Without such evidence, Davis can't carry the day. Thus, the district court was correct to grant summary judgment for Sig Sauer.

III.

Sig Sauer's decision to make a gun without a manual safety may strike many individuals who aren't familiar with firearms as odd. But to citizens who exercise their Second Amendment right to protect themselves and their families by carrying a firearm, it makes good sense. It allows them to draw, aim, and fire at a moment's notice, warding off danger and saving themselves and their loved ones from harm. That's a feature, not a bug. And so long as the owner follows the golden rule of gun safety—don't place your finger inside the trigger guard until you're ready to fire—he can feel confident carrying such a firearm, even with a round in the chamber.

\*     \*     \*

For these reasons, I respectfully dissent.